# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KAN-DI-KI, LLC (d/b/a DIAGNOSTIC LABORATORIES), | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 7937-VCP |
| ROBERT SUER, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 25, 2015
Date Decided: July 22, 2015

Mary B. Graham, Esq., Kevin M. Coen, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Robert P. Ducatman, Esq., Lisa B. Gates, Esq., JONES DAY, Cleveland, Ohio; *Attorneys for Plaintiff.*

Arthur G. Connolly, III, Esq., Christos T. Adamopoulos, Esq., Ryan P. Newell, Esq., CONNOLLY GALLAGHER LLP, Wilmington, Delaware; *Attorneys for Defendant.*

**PARSONS, Vice Chancellor.**

In this contract action, the plaintiff seeks injunctive relief against the defendant for breaches of restrictive covenants, including non-competition, non-interference, and confidentiality provisions. Through two agreements, one executed roughly a year after the other, the defendant sold his interests in two businesses that provided mobile diagnostic laboratory and x-ray services to skilled nursing facilities. The plaintiff, a large vendor of that type of services, paid the defendant $4 million in the first transaction, and roughly $300,000 in the second. Between two and three years after the execution of the second agreement, the defendant began consulting for a management company that operates nursing facilities, including some facilities that were serviced by the plaintiff. Thereafter, and with the defendant's assistance, the management company aggressively pursued reductions in the outstanding invoices it owed to the plaintiff, and later terminated all its contracts with the plaintiff to replace it with other service providers.

The plaintiff brought this action for breach of contract and several other claims. During the litigation, the defendant filed for bankruptcy, and all claims were automatically stayed. Several months later, the plaintiff obtained limited relief from the stay to enable it to pursue its breach of contract claim to the extent it seeks injunctive relief. The plaintiff pursued that claim, and this Court conducted a five-day trial regarding it in October, 2014. The plaintiff contends that the evidence supports the conclusion that the defendant breached his obligations under the restrictive covenants, and that it is entitled to broad injunctive relief as a result. The defendant disputes that assertion, and also contends that the restrictive covenants are unenforceable under both

1

Delaware and California law, that they have expired and should not be extended, and that injunctive relief is not appropriate in this case.

This Memorandum Opinion represents my post-trial findings of fact and conclusions of law. For the reasons stated herein, I hold that the covenants are enforceable, and that plaintiff has proven its claim for breach of contract and is entitled to injunctive relief. I also grant the plaintiff's pending motion for sanctions for alleged suppression or spoliation of evidence.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff, Kan-Di-Ki, LLC, does business as Diagnostic Laboratories ("DL"). DL is a California limited liability company with its principal place of business in Burbank California.[2] Defendant, Robert D. Suer, is an individual residing in California.[3]

### B. Suer and DL Enter into Various Agreements

#### 1. Suer's initial work for DL

DL is in the business of providing mobile diagnostic laboratory, ultrasound, and x-ray and related services to nursing homes, assisted living facilities, correctional facilities, and other long-term care facilities.[4] At present, DL operates in Louisiana, Texas,

---

[1] To the extent any facts are in dispute, I have used a preponderance of the evidence standard to make the factual findings contained herein, unless otherwise noted.

[2] Pre-trial Stip. and Order [hereinafter "Joint Stip."] II.A.1.

[3] Joint Stip. II.A.2.

[4] *Id.* II.A.3.

2

Arkansas, Kansas, Missouri, Nebraska, Colorado, Utah, Nevada, Arizona, New Mexico, California, Oregon, Washington, and Idaho.[5] DL is part of the western division of its parent entity, non-party TridentUSA Health Services ("Trident"), which operates in forty-three states.[6]

Suer began working in the mobile x-ray business in the late 1980s as an x-ray technician.[7] In 1998, he took a position with DL's predecessor ("Old DL"), continuing as an x-ray technician but also marketing the company's services to nursing facilities.[8] In the early 2000s, Suer was promoted to senior vice president and his duties focused entirely on marketing and sales, as well as managing six or seven sales representatives.[9] In about 2006, Dr. Jason Liu, then a radiologist at Old DL, bought out the company's previous owner.[10] Not long thereafter, Liu fired Suer.[11] Rick Navarro, who currently is the Vice President for National Accounts at DL, reported to Suer in 2007, when Suer was

---

[5]   Tr. 6 (McCullum). Citations to the trial transcript are in the form "Tr. # (X)," with the testifying witness "X" identified if not apparent from the text.

[6]   *Id.*

[7]   *Id.* at 209-10, 330-33 (Suer).

[8]   *Id.* at 210-11, 332-33.

[9]   *Id.* at 211-12.

[10]   *Id.* at 334.

[11]   *Id.*

fired.[12]  Navarro testified that Suer was "extremely frustrated" by his termination, and stated, "I'm going to take down DL.  I'm going to take down their business."[13]

In or around early 2007, Suer and a partner started a company called Reliable Mobile Medical Services, which operated in competition with Old DL.[14]  According to Navarro, Suer's new company achieved at least some degree of success, and Liu was concerned enough about it that only six months after firing Suer, Liu sought to re-hire him.[15]  Old DL re-hired Suer pursuant to an agreement dated August 28, 2007 (the "2007 Employment Agreement").[16]  The 2007 Employment Agreement provided for Suer to become President of Old DL, in exchange for which he would receive a $400,000 annual salary and certain other benefits.[17]  While the 2007 Employment Agreement did not give Suer any formal ownership interest in Old DL, it provided that if during Suer's employment either Old DL or substantially all of its assets were sold, Suer would "be entitled to receive an amount equal to ten percent (10%) of the net proceeds payable to Dr. Liu (or to any other person or entity who is a shareholder of the Company immediately before such sale)."[18]

---

[12]     *Id*. at 550 (Navarro).

[13]     *Id*. at 555.

[14]     *Id*. at 214-15 (Suer).

[15]     *Id*. at 555-56.

[16]     *Id*. at 344-45 (Suer); JX 19 (the 2007 Employment Agreement).

[17]     2007 Employment Agreement § 3(a)-(b).

[18]     *Id*. § 10.

4

## 2.      The DL Purchase Agreement

At some point in 2008, Frazier Healthcare ("Frazier") and Audax Group became interested in a transaction with Old DL.[19]  Kelly McCullum, then an employee of Frazier, had conducted due diligence on Old DL since mid- or late-2006.  On July 28, 2008, Frazier and Audax indirectly acquired Old DL through a Contribution and Equity Interest Purchase Agreement (the "DL Purchase Agreement" or "DLPA").[20]  The DLPA was structured to include a "Reorganization" in which Old DL was converted into an LLC, the interests of which would be owned by Liu and Suer.[21]  Liu and Suer, as "Sellers" under the DLPA, then would transfer their interests in that LLC—namely, Kan-Di-Ki, LLC, or DL—to the buyer-affiliated entities in connection with the DLPA closing.[22]  McCullum became the President and COO of DL, and he retained that post until 2014.[23]

McCullum was not involved in the negotiation of the DLPA.  Based on his familiarity with the transaction itself, however, McCullum testified that Suer was made a party to the DLPA because he was an "integral part" of the Old DL business, in that, for example, he occupied the position of President and held "a $4 million stake in the

---

[19]     Tr. 7-9 (McCullum).

[20]     Joint Stip. II.A.5.  The parties to the DLPA were: DL Group Holdings, LLC; Diagnostic Labs, LLC; Kan-Di-Ki Inc., d/b/a/ Diagnostic Laboratories; and certain "Sellers" defined as Suer and Liu.

[21]     JX 23 (the DLPA), Recitals; *id*. § 6.14; JX 425.

[22]     DLPA, Recitals; JX 29.

[23]     Tr. 5 (McCullum).

5

company."[24]  When the transaction formally closed in September 2008, Suer was paid $4 million under the terms of the DLPA, as his share of the purchase price for the Old DL business.[25]

Several provisions of the DLPA are important to Plaintiff's claims in this case. Section 6.9.1 provides in relevant part that:

> [E]ach Seller hereby agrees with the Buyer that such Seller will not . . . at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use, any Confidential Information involving or relating to the Business of any Acquired Company; provided, however, that the information subject to [this section] will not

---

[24]  Tr. 15.

[25]  JX 28; Tr. 366, 506-08 (Suer).  Suer characterizes his inclusion as a "Seller" under the DLPA as a sham devised by DL "to keep [him] under their control," by making him a "nominal 'owner'" even though his ownership was in fact "momentary" and "illusory."  Def.'s Post-trial Br. 3-4.  Suer also testified that he never was issued any equity interest or LLC units in DL.  Tr. 371-72.  But, Suer admits that he accepted $4 million in cash from DL in connection with this transaction.  Tr. 366-67.

The documents in the record, pursuant to which Suer accepted that sum, refute his characterization of the relevant events.  For example, in a sworn and notarized affidavit dated May 19, 2009, Suer attested that, "in furtherance of the transactions contemplated by the [DLPA], I became an owner of equity interests in Kan-Di-Ki, LLC ('KDK') . . . . All of my equity interests in KDK were purchased by the buyer . . . pursuant to [the DLPA.]  I do not believe, and did not intend, my ownership of equity interests in KDK to constitute a 'sham transaction' under California law or otherwise."  JX 50.  Although Suer disputes the validity of certain documents that appear to bear his signature, he does not deny having signed the affidavit marked JX 50.  Tr. 404.  I note in this regard that the parties each presented expert testimony on the validity of certain documents purporting to bear Suer's signature, but which Suer denies signing.  I found that testimony irrelevant to any material issue, factual or legal, because the documents in question are not relevant.  JX 30-31.  For that reason, I do not discuss any further the record relating to the alleged signature forgery.

6

include any information generally available to, or known by, the public . . . , or information that is generally known to the industry relating to the Business . . . .[26]

Section 6.11, relating to non-competition and non-solicitation, states:

For a period of five years from and after the Closing Date, no Seller will . . . engage directly or indirectly in all or any portion of the Business as conducted as of the Closing Date in California, Oregon, Washington, Idaho, Nevada, Arizona, Utah, Wyoming, Montana, Colorado, New Mexico, Texas, Oklahoma, Kansas, Nebraska, South Dakota, North Dakota, Minnesota, Iowa, Missouri, Arkansas and Louisiana, and any other geographic area in which any of the Acquired Companies conduct Business as of the Closing Date . . . .[27]

The parties defined "Business" in Section 6.11 as meaning "the provision of mobile diagnostic laboratory, x-ray, pharmacy, and other services to nursing homes, assisted living facilities, jails and other long-term care facilities."[28]

Among the transactional documents executed in connection with the DLPA, Suer's Employment Agreement was cancelled,[29] and he entered into a new "Consulting Agreement" with DL.[30] Under that agreement, Suer was retained to provide services to DL in exchange for a base salary of $125,000 per year.[31] The Consulting Agreement had a twelve-month term with the possibility of renewal, but DL retained the right to

---

[26] DLPA § 6.9.1 (the "DLPA Confidentiality Provision").

[27] *Id.* § 6.11 (the "DLPA Non-Competition Provision").

[28] *Id.*

[29] Tr. 365-66 (Suer).

[30] JX 24 (the Consulting Agreement).

[31] Consulting Agreement § 4(a).

terminate the agreement "at any time, with or without notice," subject to the payment of specified severance payments.[32]

The Consulting Agreement lasted only a couple of months before DL terminated it.[33] According to McCullum, the termination was in response to reports that Suer was preparing to compete with DL in violation of the DLPA covenants, but Suer denied having taken such actions.[34] Navarro testified that Suer, again enraged, called him cursing and threatening "to come back and . . . take business from DL."[35]

### 3.    The APA

Suer consulted an attorney about the covenants in the DLPA and other documents.[36] His counsel opined that the non-competition provisions were unenforceable, and wrote to DL in January of 2009 to advise it of Suer's position to that effect.[37] That same month, DL responded by filing suit in this Court for injunctive relief

---

[32]    *Id*. §§ 2, 5.

[33]    Tr. 377-79 (Suer); *id*. at 28 (McCullum); *id*. at 558-59 (Navarro).

[34]    *Id*. at 28 (McCullum); *id*. at 378-79 (Suer).

[35]    *Id*. at 559.

[36]    *Id*. at 380-82 (Suer).

[37]    JX 35.

against Suer.[38] That action was dismissed for lack of personal jurisdiction over Suer in March 2009.[39]

During that early 2009 time period, Suer began discussions with Cedars Clinical Laboratory, a conventional—*i.e.*, non-mobile—laboratory in southern California.[40] Suer then formed BCCC Holdings, LLC ("BCCC"), and South Coast Clinical Laboratories ("South Coast"), and acquired the assets of Cedars Clinical through those entities.[41] After DL's suit against Suer was dismissed in March 2009, it did not attempt to sue him in California, where personal jurisdiction ostensibly would have been proper.[42] Instead, DL engaged Suer in discussions about a transaction relating to South Coast.[43]

On May 20, 2009, DL and Suer executed an Asset Purchase Agreement (the "APA"). Under the APA, DL acquired substantially all of South Coast's assets, including rights and interests in a certain laboratory license, permits, books and records, goodwill, intellectual property, claims, and other rights and interests.[44] The "Seller" under the APA was South Coast, but, due to the ownership structure Suer had erected,

---

[38] Tr. 30 (McCullum).

[39] *Mobile Diagnostic Gp. Hldgs., LLC v. Suer*, 972 A.2d 799 (Del. Ch. 2009) (Chandler, C.).

[40] Tr. 382-86 (Suer).

[41] *Id.*

[42] *Id.* at 30 (McCullum).

[43] *Id.* The initial outreach in this regard apparently came from Adam Abramson, an employee of Audax, not DL. *Id.* at 391-93 (Suer); *id.* at 30 (McCullum).

[44] JX 52 (the "APA") § 2.1.

9

both he and BCCC were parties and signatories to the agreement as well.[45] In exchange for transferring the relevant assets and executing the relevant agreements, Suer, through South Coast, was paid $294,112 in cash.[46] The APA closing occurred in Wilmington, Delaware, where Suer physically executed the relevant documents.[47]

As with the DLPA, Suer characterizes the APA as merely "an avenue for imposing a new non-compete," asserting that "the business-purchase aspect was illusory" given South Coast's "negligible income and few assets."[48] Suer further intimates that he decided to enter the APA "[r]ather than litigate" with DL. In that regard, Suer testified that Adamson directly or indirectly threatened to file a new lawsuit against Suer in California, and the discussions temporarily stopped.[49]

Suer is a sophisticated businessman who ultimately decided to bind himself in the APA in exchange for negotiated consideration, and I find his reasons for doing so to be irrelevant. In any case, he has not contended that he was coerced to sign the APA or that it is void on grounds of duress, or made any similar argument. I therefore find unpersuasive the oblique comments in Suer's brief that purport to undermine the APA's validity.[50]

---

[45] APA, Recitals.

[46] *Id.* §§ 2.4, 2.5.

[47] *Id.* § 2.5.

[48] Def.'s Post-trial Br. 5.

[49] Tr. 394-98.

[50] *E.g.,* Def.'s Post-trial Br. 5-6.

10

Among the provisions the parties agreed to in the APA are three restrictive covenants, dealing with confidentiality, non-competition, and non-interference. Section 5.3, the "Confidentiality Provision," states in relevant part:

> [South Coast] and [Suer and BCCC] hereby agree with Buyer that neither [South Coast] nor [Suer and BCCC], nor any of their respective Affiliates, will, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use any confidential or proprietary information, or any trade secret information, involving or relating to the Business.[51]

As used in the APA, the term "Business" referred to South Coast's business, which the APA specified as the business of "providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services."[52]

In Section 5.4, the APA imposes certain non-competition and non-solicitation restrictions. Section 5.4.1 provides that:

> For a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will . . . directly or indirectly engage in, or directly or indirectly prepare to engage in, in whole or in part, the Business in the Restricted Area.[53]

The "Restricted Area" under the APA resembles that under the DLPA. It includes: Delaware, California, Oregon, Washington, Idaho, Nevada, Arizona, Utah, Wyoming,

---

[51] APA § 5.3 (the "APA Confidentiality Provision," and together with the DLPA Confidentiality Provision, the "Confidentiality Provisions").

[52] *Id*., Recitals.

[53] *Id*. §5.4.1 (the "APA Non-Competition Provision," and, together with the DLPA Non-Competition Provision, the "Non-Competition Provisions").

11

Colorado, New Mexico, Texas, Oklahoma, Kansas, Nebraska, South Dakota, North Dakota, Minnesota, Iowa, Missouri, Arkansas, and Louisiana, plus "any other geographic area in which [DL] or its Affiliates conduct business as of the Closing Date."[54] The next provision of the APA states in relevant part:

> For a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will . . . directly or indirectly recruit, offer employment to, employ, engage as a consultant, lure or entice away . . . any Person who is . . . an employee of [DL], [South Coast] or any of their respective Affiliates, to leave the employ or engagement of Buyer . . . . In addition, for a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will . . . directly or indirectly solicit, divert, interfere with or accept business from, or attempt to directly or indirectly solicit, divert, interfere with or accept business from any Person that is . . . a customer or supplier of [DL] or [South Coast], for the purpose of securing business competitive with Buyer.[55]

The parties further agreed in Section 5.4.3 that:

> [B]efore providing services, whether as an employee, consultant or otherwise, to any entity during the five-year period referred to in this Section 5.4, [Suer and BCCC] will provide a copy of this Section 5.4 to such employer, and cause such employer to acknowledge to the Company in writing that it has read this Section 5.4.[56]

---

[54]     *Id*. § 1 (defining "<u>Restricted Area</u>").

[55]     *Id*. § 5.4.2.

[56]     *Id*. § 5.4.3.

Thus, Section 5.4 contains non-competition and non-solicit covenants. The third major restrictive covenant in the APA is in Section 5.6, which pertains to non-interference. It states in part:

> Neither [South Coast] nor [Suer or BCCC] will . . . take any action that is designed or intended to have the effect of encouraging any lessor, licensor, supplier, distributor or customer of [DL] or its Affiliates . . . from altering its relationship with [DL] or its Affiliates in a manner adverse to [DL] or its Affiliates.[57]

The APA refers back to the DLPA, and in that regard states that, "Suer hereby acknowledges and re-affirms the validity and enforceability of each of his obligations set forth under the DL Purchase Agreement, and affirms that he has no intention of violating or challenging, and will not violate or challenge, the terms of any such obligations."[58] Collectively, I refer to the Non-Competition Provisions, the Non-Interference Provision, and the Confidentiality Provisions as the "Restrictive Covenants."

Finally, the APA contains a "Survival" clause. In that regard, Section 6.3 states that, "The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years, and (ii) the statute of limitations in respect of the subject matter described herein."[59]

---

[57]  *Id*. § 5.6 (the "Non-Interference Provision").

[58]  *Id*. § 7.3.

[59]  *Id*. § 6.3 (the "Survival Clause"). The parties dispute the effect of this provision on the issue of whether the Restrictive Covenants have expired and are therefore unenforceable. As I discuss *infra*, this dispute is irrelevant for the APA Non-Competition Provision, which expressly states that it runs "[f]or a period of five years from and after the Closing Date," which was May 20, 2009.

13

The APA was not the only agreement executed in connection with the May 2009 transaction between DL and Suer. On the same day as the APA, DL and Suer entered into a new employment agreement (the "2009 Employment Agreement").[60] That agreement outlined certain duties Suer would perform, and prescribed his base salary ($87,852 per year) and certain incentive compensation schedules.[61] The 2009 Employment Agreement had a term of three years, but it provided that Suer could be terminated with or without Cause before that time period expired.[62]

### C. Suer Begins Working for North American

After the execution of the APA and the 2009 Employment Agreement, Suer expected to begin actively working for DL. In fact, however, Suer was not given any responsibilities other than completing the discrete tasks that were identified in the 2009 Employment Agreement, which included effecting a license transfer, among other things.[63] Beyond that, Suer was given no responsibility and was not re-integrated into DL. Instead, he was told that DL would call him if he was needed.[64]

---

[60]    JX 54 (the "2009 Employment Agreement").

[61]    2009 Employment Agreement ¶¶ 2-3.

[62]    *Id*. ¶¶ 1, 5.

[63]    Tr. 411-12 (Suer). Suer complains that although he expected to gain experience from a management role at DL through the 2009 Employment Agreement, DL instead "froze him out," and "sent him home and gave him almost no work." Def.'s Post-trial Br. 5-6. To the extent Suer indirectly suggests that these events undermine the validity of the APA, I reject that argument. The 2009 Employment Agreement did not promise him any particular role within DL, nor did it even articulate specific duties he would be engaged in, other than "all duties as may be assigned to you from time to time by the Board of Managers of the Company." 2009 Employment Agreement ¶ 2. The only concrete duty evident from the

14

The evidentiary record is largely silent with respect to the time period between May 2009 and January 2012, when Plaintiff claims the alleged breaches of the Restrictive Covenants began. In late January 2012, Suer began working as an independent contractor for North American Health Care ("North American").[65] North American and its affiliates operate skilled nursing facilities in California, Arizona, Utah, and Washington.[66] North American also had a long-term business relationship with DL under which DL provided mobile x-ray and laboratory services to North American facilities.[67]

At the recommendation of an administrator at one of North American's facilities, North American's COO, Timothy Paulsen, met with Suer early in 2012.[68] Because Paulsen believed Suer's experience in working for skilled nursing facilities service providers could be valuable to North American, he retained Suer as a consultant.[69] DL contends the provisions of the DLPA and APA required Suer to show North American copies of those Agreements and cause North American to acknowledge in writing to DL

---

Agreement is the "License Transfer," which was carefully defined and included a separate salary payment, the "Licensing Assistance Salary." *Id*. ¶ 3(b). Thus, Suer's vague assertion that he "rightfully expected" a certain degree of involvement with DL and was given something less than that is unfounded.

[64]   *Id*. Plaintiff did not dispute this evidence.

[65]   Tr. 215 (Suer).

[66]   *Id*. at 1018 (Paulsen).

[67]   *Id*. at 959-60 (Paulsen).

[68]   *Id*. at 961 (Paulsen).

[69]   *Id*. at 961-63, 1022.

15

that it had reviewed the applicable non-competition agreements.[70]  There is no dispute that neither Suer nor North American complied with those obligations.

### 1.  North American cancels its contract with DL

According to Paulsen, Suer was put to work "digging into stacks and stacks of invoices," looking at how each vendor's invoices compared to North American's contracts with that vendor to determine if North American was being billed properly.[71] Suer audited invoices from DL, as well as other vendors that provided pharmacy, oxygen, and food services—"basically any vendors" North American was using at the time.[72] Suer was the "primary auditor" of North American's vendor invoices; he worked exclusively with Paulsen and provided him written reports.[73]

On March 21, 2012, Suer emailed Paulsen a draft letter addressed to DL, detailing "discrepancies" that North American had perceived based on its auditing of vendor billing statements.[74]  Suer's cover email stated, "Tim, attached is a Word document for your review that I put together.  I hope this gives you some kind of format.  Sorry it took so long but I really needed to make sure we included as much information as possible."[75] The letter concluded by stating that North American was "currently holding all payments

---

[70]    *Id*. at 1024-29; *id*. at 219-29 (Suer); DLPA § 6.11; APA § 5.4.3.

[71]    Tr. 963.

[72]    *Id*. at 964 (Paulsen).

[73]    *Id*. at 1034, 1045 (Paulsen).

[74]    *Id*.

[75]    JX 86.

to Diagnostic Laboratories until we have some type of response from your company in regard to the errors that have occurred."[76] The next day, Paulsen emailed essentially the same letter that was attached to Suer's email to several individuals at DL.[77] Paulsen testified that he wrote the draft letter and gave it to Suer with instructions to give Paulsen numbers and documents that would illustrate the relevant billing discrepancies.[78] Individuals at DL met with Paulsen after receiving the March 22, 2012 letter to try to persuade him that North American's auditing analysis was erroneous. But Paulsen maintained his position, demanding that DL either write down its receivable balance or credit North American to offset the perceived over-billing.[79]

North American withheld payment on roughly $800,000 in charges invoiced by DL.[80] Documentary evidence from the end of March 2012 indicates that North American was planning to cancel contracts with DL relating to all of North American's skilled nursing facilities in the southern California area.[81] Suer actively assisted Paulsen in this

---

[76] *Id.*

[77] JX 87. Any differences from the draft letter appear to be immaterial.

[78] Tr. 965-66. Because of the language in Suer's March 21, 2012 email (JX 87), and the fact that it was sent to certain individuals at DL that Suer knew but Paulsen did not, it is possible that Suer drafted the JX 87 letter, rather than Paulsen. *See* Tr. 186-87 (McCullum). For purposes of my decision, however, I need not resolve that factual dispute.

[79] *Id.* at 116 (McCullum).

[80] *Id.* at 987-89 (Paulsen). DL apparently has never insisted that the $800,000 balance be paid. *Id.*

[81] JX 88, 93, 94, 95, 100.

17

regard. On April 10, 2012, Paulsen forwarded Suer an email chain between a North American facility administrator and DL entitled "Cancellation Letter."[82] In one of those emails, Paulsen instructed the administrator to "Please call Bobby [Suer] to discuss a response to [DL]."[83]

Events became more contentious in April and early May, 2012. An attorney for DL emailed Suer and his attorney, advising Suer that, "You should stand down from your current activities with DL's competitors and customers and comply in full with all applicable agreements to which you are a party with us."[84] On May 7, 2012, outside counsel for DL sent a letter to John Sorensen, the CEO of North American, advising him that DL had become aware of North American's affiliation with Suer.[85] The letter enclosed copies of the APA and the DLPA, and stated that, "Mr. Suer has, in his recent dealings with your organization and others, breached these covenants and other obligations. It is possible that, inadvertently or otherwise, you may have induced a breach of these contracts."[86] The same day, DL's counsel sent cease and desist letters to the following competitors of DL: Town & Country Diagnostics ("Town & Country"); B.O.N. Clinical Laboratories, Ltd. ("B.O.N."); First Choice Mobile Radiology; Outreach

---

[82] JX 109.

[83] *Id*. Paulsen and other North American employees forwarded to Suer a number of communications with DL. *See, e.g.*, JX 117, 120.

[84] JX 122; *see also* JX 104 (earlier communications between the same DL attorney and Suer).

[85] JX 125.

[86] *Id*.

18

Solutions, LLC; Quality Medical Imaging, Inc. ("Quality Medical"); and UCI Medical Center.[87]

In late May or early June, 2012, Paulsen met with McCullum and Bill Treese. Treese recently had been hired by DL, but he previously worked as a consultant for its competitors, including B.O.N. and Quality Medical.[88] McCullum invited Treese to the meeting because Treese had a relationship with Suer, and McCullum wanted him to warn Paulsen about doing business with Suer.[89] McCullum believed Suer was influencing Paulsen and North American's decisions about DL, and did not want Suer, "a disgruntled employee," to poison the "good corporate relationship" DL had had with North American.[90] Paulsen falsely told McCullum, however, that he had no knowledge of Suer's activities, and that Suer was not working with North American in any capacity.[91] Within the next few days, Paulsen forwarded to Suer a series of emails he had received from McCullum, relating to North American's contracts with DL at several facilities.[92] According to Paulsen, Suer needed the contract information to complete his audit of the

---

[87] JX 126, 127, 128, 129, 130, 133.

[88] Tr. 1231-32 (McCullum). Paulsen's and McCullum's testimony differed as to how many meetings took place between Paulsen and Treese. *See id*. at 999 (Paulsen). McCullum's testimony was more credible in this regard, but it ultimately is immaterial to my decision whether one or two meetings took place or precisely when.

[89] *Id*. at 1232-33.

[90] *Id*. at 1237.

[91] *Id*. at 1237-38.

[92] JX 148, 254, 145, 146, 147.

19

DL invoices.[93]  The exchanges between Paulsen and McCullum show that McCullum and others at DL were trying to avoid losing North American's business over the billing disputes.[94]

Starting on June 26, 2012, at least eighteen North American facilities terminated the x-ray and laboratory services contracts they had with DL.[95]  Each of the Cancellation Letters contained identical wording.  Indeed, thirteen letters dated either June 26 or 28 contained the same typographical error, beginning the letter "Dear Mr. McCullem," even though the address block correctly identified the recipient as Kelly McCullum, DL's President.

Suer was directly involved in this coordinated effort of North American.  On June 25, 2012, Suer emailed the administrator of North American's Park Ridge Skilled Nursing Center, stating:

> Attached is a copy of a cancellation letter for you to sign and send to Diagnostic Laboratory and Radiology . . . .  As most of you are aware we have had severe over billing issues (Not charging the facility according to the contracts) . . . At this time we will no longer want to utilize their services moving forward.  Please open the attached cancellation notices with your named facility and sign then fax and mail (certified mail).[96]

---

[93]  Tr. 979.

[94]  *E.g.*, JX 147.

[95]  JX 156-164, 168-171, 176-180 (the "Cancellation Letters").

[96]  JX 155 (emphasis omitted).  In this regard, Paulsen testified that he wrote the email, but that Suer sent it (from Suer's own email) because Paulsen "was out of the office or something."  Tr. 975.  Based on the totality of the documentary and

Although the email is signed "Thank you, Tim Paulsen," it was sent by Suer.[97] The Park Ridge administrator sent its cancellation letter to DL the following day.[98] Similarly, in an email to Paulsen on July 3, 2012, Suer wrote, "Tim, here is the cancellation notice for Scottsdale to send to Shawn when he is ready. You have the cover letter. Thanks, Bobby."[99]

Suer's involvement in this regard also is evidenced by several emails from Paulsen to North American facilities administrators. On July 5, 2012, Paulsen emailed several such administrators, saying North American had identified new vendors to replace some of the mobile lab and x-ray services in the southern California area.[100] He concluded by observing that, "You should see excellent services and a significant reduction in costs with these new vendors. But, as always, let us (Bobby Suer or myself) know if that is not the case."[101] Paulsen also sent an email on July 31, 2012 to numerous recipients, including individuals at DL and administrators at various North American nursing facilities, confirming that, pursuant to the Cancellation Letters, DL would cease

---

testamentary evidence surrounding these events, I do not find that assertion credible and find, instead, that Suer had a major role in drafting the email.

[97] JX 155.

[98] JX 162.

[99] JX 175. Paulsen also denied that Suer would have written this cancellation notice, suggesting that he "may have sent it to [Suer] for review or something to look at." Tr. 977. As with JX 155, *supra* note 96, Paulsen's explanation is not credible.

[100] JX 181.

[101] *Id*.

21

providing services to certain North American facilities as of that date.[102] Suer was blind-copied on the email, along with three other North American employees.

Ultimately, all of DL's twenty-seven contracts with North American facilities were cancelled.[103] Sorensen, North American's CEO, testified that he believed DL to have engaged in "gross overbilling, calculatingly, very cleverly done, on a consistent basis for many, many, many months."[104] Sorensen believed that DL overbilled North American by about $950,000.[105] He also admitted that he "wouldn't know about it if it weren't for [Suer]."[106] Throughout August and September 2012, administrators at the North American facilities sent letters to DL, in which they detailed the final results of the billing audit for that particular facility, and then subtracted the purported overbillings from the total invoices outstanding to calculate a reduced, net amount North American owed to DL for that facility.[107] Paulsen testified that he drafted these letters, and Suer "provided numbers" for them.[108] By letters dated September 27, 2012, DL disputed

---

[102]    JX 190.

[103]    JX 426; Tr. 44-45 (McCullum).

[104]    Tr. 1088.

[105]    *Id*. at 1089.

[106]    *Id*. at 1087.

[107]    JX 192-194, 196, 197, 199-203, 205-207, 209-215, 218, 219, 224-230, 244.

[108]    Tr. 1067 (Paulsen). Based on the documentary evidence, I find that Suer was at least a co-author of these letters. *See, e.g.*, JX 192 ("Tim[,] attached and complete [is] Palm Terrace . . . Be there shortly to review[.] Bobby."); JX 204 ("Tim, Please disregard any previous versions of Brentwood this is the final version [sic]. I

22

North American's claims of overbilling, and rejected its suggestion that, by remitting payment for the undisputed amount, North American had paid DL in full.[109] On October 5, 2012, a North American facility administrator forwarded one such DL letter to Suer.[110]

Paulsen, with approval from Sorensen, made the final decision to terminate the contracts with DL.[111] Paulsen specifically denied that Suer encouraged Paulsen to cancel DL's contracts or had any part in that decision, except for reviewing the contracts and invoices and "giving [Paulsen] accurate numbers."[112] As in the situations previously noted, however, I consider Paulsen's efforts to minimize the importance of Suer's role in North American's decision to cancel its contracts with DL to be unreliable, at a minimum. Rather, I find that Suer played a key role in bringing about those decisions and that the preponderance of the evidence shows that it was unlikely that, based on Suer's prior interactions with DL, including his entry into the DLPA and APA, that Suer could or, in fact, did conduct the underlying North American "audits" of DL's invoices in an impartial and fair way, consistent with his contractual obligations to DL.

Suer attempts to rebut this proposition by pointing to emails from the June-July 2012 time period in which he communicated with McCullum and Thomas McCaffery,

---

eliminated x-ray on this one because . . . Also I rewrote the lab portion of the letter . . . Let me know . . . Bobby.").

[109]    JX 231-243.

[110]    JX 245.

[111]    Tr. 985 (Paulsen).

[112]    *Id*. at 986.

DL's general counsel, and offered to help resolve the situation between DL and North American.[113] In addition, Suer communicated with Bill Treese, then an employee of DL, and sought to use Treese as a "conduit" to facilitate discussions between DL and North American.[114] Even assuming Suer made these overtures to DL in good faith, however, I consider it more likely than not that Suer was interested in trying to broker some form of compromise between North American and DL. But, that still would leave DL in a worse position than it was in when Suer began the course of conduct with North American that DL claims breached one or more of the Restrictive Covenants.

This aspect of Suer's version of the relevant events brings up a related theory Defendant has advanced: that Treese was "brought into the fold" by DL in early 2012 "as its eventual star witness" in this litigation.[115] Suer further asserts that even before Treese left B.O.N. to work for DL, he "served as a mole, conversing with Suer and secretly reporting back to DL."[116] As colorful as those contentions are, they are only somewhat supported by the documentary evidence. For example, on April 4, 2012, Treese emailed Navarro and McCullum, writing:

> I received a call from Bobby last night frantically questioning who I had spoken to re N American [sic]. . . . I am positive that he is at the breaking point and can be pushed off changing DL at the N American buildings. I believe that if he is given the option of an expensive, prolonged lawsuit or of

---

[113]    JX 183, 435.

[114]    Tr. 725 (Treese); JX 435; Tr. 155-56 (McCullum).

[115]    Defs.' Br. 8.

[116]    *Id.*

24

suggesting to Tim that DL remain as the sole provider, he will choose the latter.

I will get another call from him this morning . . . . It is imperative that I keep these lines of communication open so I continue to get information. It is in our best interest . . . . If we have to alter course on this plan I will do what is necessary to keep the accounts.[117]

That email was sent from Treese's B.O.N. email address, although he admits he was "transitioning from B.O.N. to become an employee of [DL]" at that time.[118] Three weeks later, McCaffery, DL's general counsel, sent an email entitled "litigation call" to Treese and Jones Day, DL's counsel in this action, in which he instructed an assistant to "set up a 60 minute call for Bill, [Jones Day] and me early next week."[119] In July 2012, McCaffery asked Treese if he would travel to Cleveland, "[a]ll expenses paid."[120] Treese accepted, and spent at least a day and a night in Cleveland, meeting with Jones Day.[121] Before the end of July, Treese emailed Jones Day to say that he had "searched far and wide" and was going to send Jones Day his email correspondence with Suer.[122]

---

[117]    JX 102.

[118]    Tr. 740 (Treese).

[119]    JX 436. Treese did not recall whether such a conference call took place. Tr. 748.

[120]    JX 439.

[121]    Tr. 750-55 (Treese).

[122]    JX 450. At trial, Treese admitted that his statement to Jones Day in JX 450 was false, as he had "searched his emails quickly," and that it was "a little exaggeration" to say he searched far and wide. Tr. 756. Treese also admitted that he exaggerates from time to time. *Id.*

Treese's employment with DL lasted only from April to December of 2012.[123] Treese testified both evasively and unconvincingly about the circumstances in which his employment with DL ended. He described it as "a mutual parting of the ways," but also indicated that he knew he was going to be fired, for reasons unknown to him then or now.[124] The unpersuasive nature of that situation is enhanced by the fact that DL chose and paid for an attorney to represent Treese in connection with this "parting of the ways."[125] On December 11, 2012, Treese and DL executed a release and settlement agreement in connection with Treese's termination, not for cause.[126] Pursuant to that agreement, DL agreed to pay Treese $450,000 in equal installments until December 2015.[127] Among the obligations Treese undertook as consideration for that remarkably

---

[123]    Tr. 743-47 (Treese).

[124]    *Id*. at 744; *see also id.* at 744-45 ("Q. Were you told why you were going to be terminated? A. No. Q. Did you ask? A. I did. Q. Were you told? A. There were a lot of reasons. Q. Were any cited? A. Nope. Q. Did you accept that answer? A. I did."); *id.* at 776 ("And I had asked you before why you were terminated from DL. A. Yes, sir. Q. And do you have an answer for that yet? A. No. I told you that I had counsel and I was told that there were many reasons. And I was given an offer and I took it. Q. Now, if I remember, you said you didn't ask what the reasons were. A. I said I did ask. Q. You did ask but didn't get an answer? A. I got a lot of answers. Q. What were the answers? A. I don't recall the answers."). Apparently, once Treese found out he was going to be terminated, he understood that an attorney would be hired to represent him, and that he was to communicate only through the attorney regarding this matter. *Id*. at 778.

[125]    Tr. 745-47 (Treese).

[126]    JX 249.

[127]    *Id*. § 3.1(a). Treese also is receiving certain health insurance benefits. *Id*. § 3.1. Suer improperly attempted in his post-trial brief to present evidence of a standard or typical severance package, in an effort to show that Treese's was excessive.

26

high severance payment was that he "shall be obligated to cooperate with [DL] in any litigation or administrative proceeding involving [DL]," and to refrain from "voluntarily aid[ing] or assist[ing] any person . . . involved in any proceeding . . . against [DL or its affiliates and employees]."[128]   Treese also testified that Trident, DL's parent, is paying his legal fees and costs in defending a lawsuit B.O.N. brought against him in Nevada.[129] According to Treese, he took ninety to ninety-five percent of B.O.N.'s mobile x-ray and laboratory business when he moved to DL.[130]

Based on those facts and other perceived inconsistencies, Suer urges this Court to disregard Treese's testimony entirely.  I find the circumstances of Treese's departure from DL and his entry into a seemingly far more than generous settlement agreement sufficiently suspicious that they render Treese's credibility questionable, at best.  As noted in several instances, *infra*, that lack of credibility is problematic for Plaintiff's effort to prove certain of the breaches of contract it has alleged.  I decline, however, to disregard Treese's testimony entirely, and afford it some credibility, particularly in instances where it is corroborated by other witnesses' accounts or documentary evidence.

---

DOB 44-45.  Because Suer failed to provide advance notice of such evidence in accordance with the Rules and orders of this Court, I have not considered it. McCullum testified that DL's standard practice for such severance payments varied according to the situation.  Tr. 178-82.

[128]   JX 249 § 4.4(b).

[129]   Tr. 754.

[130]   Tr. 742.

### 2. North American finds vendors to replace DL

Plaintiff contends that Suer breached his obligations under the DLPA and the APA in numerous respects, and presented extensive evidence in that regard. The following facts, which I address in the order Plaintiff presented them, are relevant to the claimed breaches.

### a. Schryver Medical

As to Schryver Medical, DL asserts that an April 2012 email from Suer to Mark Schryver evidences Suer's competition with DL.[131] Schryver owns Schryver Medical, which provided mobile laboratory and x-ray services to certain North American facilities in Washington, Utah, and Arizona.[132] The April 2012 email itself is ambiguous. A fair reading of that document, however, gives the impression that Suer's activity in this regard was nothing more than auditing the relevant bills and attempting to obtain credits for North American facilities already serviced by Schryver Medical, rather than attempting to replace DL with Schryver Medical at other facilities.[133] Schryver's deposition testimony does not alter that impression,[134] and it was the only testimony DL cited in support of its position on this issue.[135]

---

[131] JX 118.

[132] *Id.*

[133] *Id.*

[134] Schryver Dep. 11-26, 41-43.

[135] Pl.'s Opening Br. ("POB") 28-29; Pl.'s Reply Br. ("PRB") 12.

### b. B.O.N.

Treese testified that in late 2011 or early 2012, while he was with B.O.N., Suer met with him and proposed that Suer would help Treese acquire North American's business in southern California, if B.O.N. would pay Suer $2,000 per facility.[136] Suer called that testimony "absolutely false," and denied that he ever made such a proposal to Treese.[137] Suer did exchange emails with Treese about meeting in August 2011, but those communications do not reflect whether the meeting took place, or the substance of what was discussed if they did.[138]

Treese further testified that he met with Paulsen and Suer on or around February 28, 2012, about a proposal for B.O.N. to provide mobile laboratory services for sixteen North American facilities in southern California.[139] Suer and Paulsen emphatically denied that Suer attended that meeting.[140] On March 1, 2012, Treese and Paulsen exchanged emails, in which Treese thanked Paulsen for the meeting and the two discussed potential services contracts.[141] Suer is neither copied on the emails, nor

---

[136] Tr. 699-700. Treese testified that he took that proposal to Mike and Sonia Avedissian, the owners of B.O.N. *Id*.

[137] Tr. 1131-32.

[138] JX 66.

[139] Tr. 701-02; JX 455.

[140] Tr. 1132-33 (Suer); *id*. at 998-99 (Paulsen).

[141] JX 455.

mentioned directly or indirectly in them.[142]  Treese testified that he provided draft agreements to Paulsen, but that B.O.N.'s owners ultimately decided not to proceed with the contracts because they did not want to pay Suer's fee of $2,000 per-facility.

Suer's and Paulsen's accounts of these events differed dramatically from Treese's. Suer and Paulsen each testified that a deal for B.O.N. to service North American's southern California facilities made no sense because B.O.N. was located in Nevada.[143] The contemporaneous documents in the record do not indicate that Suer had a part in the discussions between Treese and Paulsen in late February and early March, 2012.[144]  The only evidence of Suer's involvement in the potential transactions between B.O.N. and North American is Treese's testimony, which, for the reasons I discussed above, is not entirely credible.  Specifically, in relation to the facts surrounding Suer and B.O.N., I find Treese's account less credible than the weight of the documentary and other testimonial evidence.  Thus, DL has not proven by a preponderance of the evidence that Suer "acted as a facilitator and liaison between North American and B.O.N. to assist B.O.N."[145] in competing with DL.[146]

---

[142]    *Id.*

[143]    Tr. 997-98 (Paulsen); *id.* 1133 (Suer).

[144]    JX 455; JX 135 (Letter from B.O.N. responding to a letter from DL, in which B.O.N. asserted that it was "in no way affiliated with Suer, nor has it been affiliated with Suer in the past.").

[145]    PRB 12; *see also* POB 29-30.

[146]    As discussed *infra* in Section IV, DL's successful Motion for Sanctions did relate to the Treese evidence insofar as Suer deleted his email communications with Treese in early 2012, and at least some of those deletions took place after Suer was

### c. Quality Medical

Treese also testified that Suer proposed to help Quality Medical, another direct competitor of DL's, to obtain mobile x-ray contracts with North American facilities, in exchange for a $10,000 per-month consulting fee.[147] On January 5, 2012, Treese emailed the administrator at Coventry Court, a North American facility then serviced by DL, with a proposed contract for Quality Medical to provide mobile x-ray and ultrasound services to Coventry Court.[148] Treese copied Suer on the email, and opened by saying that, "Our mutual friend asked that I email you the attached [contract] for your review."[149] Suer admitted that he was the "mutual friend," but he denied having told Treese to send the email.[150] Two weeks later, Suer emailed a list of North American facilities to Treese, writing simply, "here you go brother."[151]

---

under a duty to preserve. DL is thus entitled to an adverse inference against Suer regarding the Treese situation, as it is with the UCI, Town & Country, and CERF Laboratories. As noted below, in terms of UCI and Town & Country, the adverse inference against Suer materially impacted my findings relating to those alleged breaches. *See infra* Section I.C.2.d-e. The evidentiary record as to B.O.N., however, is sufficiently strong that an adverse inference does not cause me to reach a different conclusion. Additionally, as discussed *supra*, there are serious questions about the credibility of Treese's testimony in favor of DL, and I decline to overlook those concerns based on Suer's improper deletion of certain emails. Thus, despite its successful Motion for Sanctions, DL has not proven this particular alleged breach.

[147]   Tr. 709-10.

[148]   JX 73.

[149]   *Id*.

[150]   Tr. 1137 ("All I said is, 'You can contact them directly.' [Treese] wrote the e-mail. I did not respond to the e-mail. I did not say that you can go out—you know, it's

Unlike with B.O.N., the contemporaneous documents relating to Quality Medical corroborate Treese's testimony that Suer was assisting him in attempting to acquire business from North American for Quality Medical. On January 30, 2012, Roger Faselt, the owner of Quality Medical, emailed Treese contract proposals for x-ray services at eleven North American facilities.[152] Faselt wrote:

> Bill, I have attached the contracts. They are at 80% which would be a much better place for us to be. Discuss with BS, do we really need to go in that low at 70%, considering how high there [sic] charges are now? I know he is trying to save them money and justify his cut, but that whacks a lot of our profit right off the top. . . . Let me know what you think.[153]

The following morning, Treese forwarded that email to Suer without comment.[154] On April 3, 2012, Faselt again emailed Treese, attaching revised contracts for the North American facilities, and writing, "This is revised for BS."[155] Treese forwarded this email,

---

not up to me. It has no bearing on me. I just—all I said to him was, 'If you want to contact them directly, be my guest. Contact them directly.'").

[151] JX 77. Suer explained that, "after I told [Treese] that I could not help him with anything, [he] asked me if I would forward him a copy of the North American facility list to him so that he could directly call any administrator or anybody. And so it was an attached list, just a list of all the facilities. That's all I gave to him, was a list." Tr. 1136-37.

[152] JX 78; Tr. 710, 713-16 (Treese).

[153] JX 78.

[154] *Id*.

[155] JX 96. The "BS" referred to in these emails was Suer. Tr. 714, 716 (Treese). I note that Suer did not deny that "BS" referred to him.

too, almost immediately to Suer, with the annotation, "Roger's new contract."[156] Treese testified that Suer had requested the revised contracts.[157]

Suer "[a]bsolutely" denied having proposed to Treese any such arrangement with respect to Quality Medical.[158] He attributed his being copied on the emails from Treese concerning Quality Medical to Treese having asked Suer if he would help him obtain business from North American facilities, but Suer says he responded that he had no power to assist.[159] He further denied ever requesting any proposed contracts from Quality Medical, and dismissed all the emails as "a setup."[160] Suer's explanations in this regard are not credible in light of the contemporaneous documents that indicate his role was more active than he admits. Specifically, the emails involving Suer, Treese, and Faselt demonstrate that Suer was providing information to Quality Medical about the pricing they should offer to North American to capture its business—*i.e.*, whether Quality Medical needed to bid at 70% of a certain pricing schedule, or if 80% would be sufficiently low to ensure success. I infer that the 80% and 70% figures were with

---

[156] JX 96.

[157] Tr. 716

[158] *Id*. at 1134.

[159] *Id*. at 1135-36.

[160] Tr. 1140-41 (Suer). Suer also notes that the emails do not reference the alleged $10,000 fee, and that he "barely respond[ed] if at all" to those on which he was copied. DAB 41. As explained in the text, it is ultimately immaterial whether the alleged offer of a $10,000 per month consulting fee that Treese referred to actually was received by Suer. Further, I find Suer's minimal or non-existent responses insufficient to absolve him in this regard.

33

reference to the pricing schedules North American had in place with its then-current vendor, DL, and that Suer's input allowed Quality Medical to undercut DL. The documentary evidence also supports Treese's testimony that Suer expected some form of compensation for his assistance. In any event, the salient fact is that Quality Medical was bidding for North American's business with the active assistance of Suer.

Taking all of the evidence regarding Quality Medical into consideration, I find that Suer did facilitate Quality Medical's acquisition of business from certain North American facilities that previously had been serviced by DL. In that regard, the record also shows that Quality Medical was one of the vendors selected to replace DL after North American cancelled its DL contracts in 2012.[161] Quality Medical currently provides x-ray services to twelve North American facilities.[162]

### d. UCI and Town & Country

DL asserts that Suer assisted North American in communicating with, and evaluating proposals from, University of California Irvine Medical Center ("UCI"), which provides x-ray and laboratory services in competition with DL.[163] Shaun Dahl, an administrator at North American's Coventry Court facility, was contacted by Kelly Ewing of UCI in or around December 2011 about the possibility of UCI providing services to Coventry Court.[164] DL contends that Dahl's testimony and certain text

---

[161] JX 423; JX 315; Tr. 716 (Treese); *id*. at 1154 (Suer).

[162] Tr. 1061 (Paulsen).

[163] Dahl Dep. 114; JX 140.

[164] Dahl Dep. 112-15.

34

messages between Dahl and Suer from the April 2012 time period show that Suer helped

UCI compete with DL.[165]

Dahl's testimony is inconclusive at best. The strongest impression it leaves is that, while Suer and Dahl had some communications relating to UCI, Suer did not take any action to facilitate UCI's acquisition of North American business.[166] The documentary evidence consists of a small number of text messages and one email that Dahl forwarded to Suer. That evidence reinforces the overall impression from Dahl's testimony, which is that Ewing repeatedly pursued him for business, and on occasion Dahl tried to direct him

---

[165]    POB 34-35; JX 98-99.

[166]    Dahl Dep. 115-34; *see, e.g.*, *id.* at 116 ("Q. Why did you connect UCI to Bobby? A. Bobby was consulting with Tim Paulsen, and since UCI was wanting to be in the business, I made that introduction."); *id.* at 119 ("Q. What did Bobby say upon receiving the UCI proposal? A. To the best of my recollection, I don't recall really discussing the UCI contract with Bobby. It was more with Tim that I had the conversations with. Q. Did Tim indicate that he had discussed it with Bobby? A. I don't recall."); *id.* at 125 ("Q. Was [Suer] giving you insights about UCI? A. He wasn't necessarily talking to me. As you can see, there was some time gap [in the text messages], so we weren't in direct communication. I think probably more so with Tim.").

to Suer or Paulsen.[167]  Ultimately, UCI failed to acquire any of North American's business.[168]

DL also relies on Dahl's testimony and text messages with Suer to prove that Suer assisted Town & Country, another DL competitor.[169]  Unlike UCI, Town & Country was successful in obtaining contracts to service certain North American facilities previously serviced by DL.[170]  One text message from Dahl to Suer references a Rick Greene of Town & Country, but neither that message nor the context of the text messages in general suggest that Suer actively assisted Town & Country in acquiring business from North American.[171]  As in the case of UCI, Dahl's testimony in this regard was inconclusive.[172]

---

[167]  The text messages reflect a relatively small number of communications spread over the period from April through December, 2012.  JX 98-99, 221-222.  They add little, if anything, to the weight of Dahl's deposition in relation to DL's assertions regarding UCI.  Indeed, many of the texts appear to relate to Suer's auditing of bills for North American, and have nothing to do with UCI or other vendors.  The April 10, 2012 email from Ewing to Dahl, which Dahl forwarded without comment to Suer, provides no basis for me to conclude otherwise.  JX 108.

[168]  Dahl Dep. 118-19.

[169]  POB 37.

[170]  Dahl Dep. 132-33; JX 181.

[171]  JX 98-99, 221-222.

[172]  Dahl Dep. 132-37; *id*. at 135-36 ("Q. . . . Why are you and [Suer] communicating about Town & Country?  . . . [A.] Rick [Greene] had called me about Beachside, and so I think I forwarded – I needed Rick's number here . . . So I knew Bobby would have the number and so I thought it would be just the easiest thing to text him.").  Treese's testimony about Suer's involvement with Town & Country contains no factual information that would cause me to alter my finding in this regard.  Tr. 716-17 (Treese).

I note also that both UCI and Town & Country disclaimed in writing to DL that they had any affiliation whatsoever with Suer.[173]

On its own, this evidence would not enable me to find, by a preponderance of the evidence, that Suer assisted UCI or Town & Country in competing with DL for North American's business. As discussed *infra* in Section IV, however, DL has shown in its Motion for Sanctions that Suer recklessly destroyed or failed to preserve evidence that relates directly to the text messages exchanged between Dahl and Suer in connection with, among other things, the UCI and Town & Country situations. I therefore draw an adverse inference against Suer in this regard, and conclude that the apparently missing text message evidence involving Suer would have supported DL's allegations.[174] For that reason, I find that Suer did assist UCI and Town & Country in competing with DL.

### e. CERF Laboratories

DL avers that Suer assisted CERF Laboratories, a DL competitor, after it replaced DL as the provider for certain North American facilities. On July 24, 2012, Paulsen emailed administrators at several North American facilities, as follows:

> I understand that Elena from CERF Lab has been to visit a few of you this week (and will visit all soon). I apologize that her visit may seem rushed ("here's a contract, please sign . . .") but we wanted to ensure that your lab services would not be interrupted when Diag Lab term[inates] on July 31st. If you have any concerns with the transition process, please

---

[173] JX 137, 140.

[174] *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006).

contact me or Bobby Suer and we will make sure your needs are met.[175]

Suer evidently did have some contact with North American administrators in connection with the CERF transition. A text message from Suer to Dahl that also references "Elena," states, "I told Elena from cerf labs to get a hold of you to try a test with your computer e faxing. Not sure if u two connected to test it let me know."[176] Thus, Suer was involved in at least some capacity in assisting North American and CERF when CERF began servicing some of North American's facilities in July 2012.[177] This finding is corroborated by other evidence suggesting that Suer was involved on behalf of North American with the transition to new service providers generally in the July-August, 2012 time frame.[178]

---

[175] JX 187.

[176] JX 98-99. Dahl's testimony about Suer and CERF comported with what can be gleaned from the face of the texts and email. JX 187; JX 98-99; Dahl Dep. 137-41, 196-97.

[177] As noted *supra* in connection with UCI and Town & Country and discussed *infra* in Section IV, DL is entitled to have certain adverse inferences drawn against Suer because DL prevailed on its Motion for Sanctions. I did not rely on such an inference in finding that Suer assisted CERF Laboratories in this regard, but it would reinforce that conclusion.

[178] On July 5, 2012, for example, Paulsen stated in an email to several North American facility administrators that: "As you are aware, we have been reviewing proposals from New Lab and Radiology vendors to replace some of our current contractors in southern California. Through this RFP process three new vendors have been identified. . . . You should see excellent services and a significant reduction in costs with these vendors. But, as always, let us (Bobby Suer or myself) know if that is not the case." JX 181. I therefore reject as unreliable Suer's testimony that North American "never asked me to do anything with replacement vendors." Tr. 431.

### 3. Suer's use of DL's Confidential Information

Plaintiff also asserts that Suer breached his obligations under the Confidentiality Provision of the APA, based, in part, on the following. First, the record shows that in April 2012, when Suer was assisting Paulsen and North American in auditing invoices and confronting its service providers, Suer accessed a DL customer receivables list (the "Receivables List") that he had obtained in the course of his employment with DL and saved in his email account since 2008.[179] The Receivables List contained detailed information about DL's customers, including the volume of services DL was providing to each, as well as their outstanding invoices and payment history.[180] Aside from an email receipt showing that on April 16, 2012 Suer opened the email to which the Receivables List was attached, DL did not adduce any evidence that Suer actually accessed the List or used it. Thus, the record indicates, at most, that Suer read that particular email in April 2012. Beyond that, DL's evidence is circumstantial only and of limited probative value.

Second, DL contends that the facts surrounding Suer's assistance of Quality Medical in its pursuit of North American's business show that he used DL confidential information. Based on the relevant facts recited *supra*, I find that Suer was providing information and insight to Faselt and Quality Medical about DL's pricing schedule, and that more likely than not Suer used or disclosed DL's Confidential Information in that context.

---

[179]    JX 454.

[180]    Tr. 107-08 (McCullum); *id*. at 623-26 (Navarro).

Third, DL accuses Suer in general terms of improperly using his knowledge of DL's business to assist North American in altering its relationship with DL. The most particularized facts in this regard relate to Suer's knowledge that DL relied on certain large customers like North American, and that, because of pressures from its investors, if DL were confronted by its customers during the relevant time period about perceived over-billing, it would capitulate to their demands for invoice reductions or credits. The record supports DL's allegations that, during his meetings and communications with DL, Paulsen exhibited more than public knowledge of DL's vulnerability and business practices, and that Paulsen's approach to DL was particularly hard-nosed as a result.[181]

### 4. Later-occurring evidence

As the preceding sections demonstrate, the record DL adduced through testimony and documentary evidence focused heavily on Suer's actions during the first half of 2012. Only one written communication cited thus far occurred in August 2012,[182] and one other occurred in October 2012.[183] The rest are densely clustered in the months of March through July 2012. In that sense, the factual record goes mostly cold after July 2012, and totally cold after December 2012.[184] DL commenced this action on October 10, 2012. At

---

[181]    Tr. 22-23 (McCullum).

[182]    JX 192 (Aug. 2, 2012 email from Suer to Paulsen).

[183]    JX 245 (Oct. 5, 2012 email from Dahl to Suer).

[184]    As discussed *infra* in Section IV, a small number of text messages between Dahl and Suer, which were implicated in DL's Motion for Sanctions, were sent in early December.

40

trial in late 2014, DL also presented evidence of certain actions that occurred after 2012. I note two such actions in particular.

First, on September 16, 2013, an administrator at one of North American's facilities sent Suer an email on the subject "Lab Contract." The email stated, "Do you have any updates on a lab company for NorCal? Who are you looking at? Thank you for your assistance."[185] Two weeks later, the same administrator forwarded Suer an email that appears to be from a potential lab company, which stated: "Bobby, I received this in the email. Is this the company you have already been speaking with?" Two minutes later, Suer replied, "James yes. I will call u later [to] discuss."[186] Regarding these emails, Suer testified that a laboratory in northern California "went out of business completely and all the nursing homes up there were going to be without lab service," so North American was "frantically" looking for a replacement provider.[187] DL accuses Suer of improperly helping to "find a laboratory service provider for North American facilities in Northern California, a region previously served by DL."[188]

The cited emails arguably support that assertion, but only in the most general sense. Suer testified that North American "had asked me to just research if I knew any laboratories up there."[189] DL presented no evidence as to what, if anything, Suer actually

---

[185]    JX 286.

[186]    JX 292.

[187]    Tr. 527 (Suer).

[188]    POB 38-39; PRB 17-18.

[189]    Tr. 537 (Suer).

41

did in response to the September 13 email, or what he meant when he wrote his September 26 email, or whether he had further communications with the author and to what effect.[190] Thus, the evidence shows only that in September 2013 Suer provided some minimal assistance to North American in finding a laboratory services provider in northern California by searching for a vendor, and possibly spoke with at least one such vendor.

The second action taken by Suer in September 2013 that DL highlights involves his mother, Chris Walter. She is a retired nurse who did some infection control work at Coventry Court, a North American facility. Walter emailed Suer when a payment owed to her was delayed, and he forwarded the email, without comment, to someone at North American.[191] DL complains that by "serving as a liaison to facilitate payment for an invoice from" his mother, Suer was "able to keep some of the North American business in the family" while also "displacing DL," which previously provided infection control services to Coventry Court.[192] Other than the email thread containing Suer's forwarding email, the record on this issue is paper thin.[193] According to Dahl, the administrator at

---

[190] *Id.* at 308 (Suer) ("Q. . . . You wrote that e-mail [JX 292]; isn't that true, sir? A. Yes."). Suer's deposition testimony failed to provide any additional detail. Suer Dep. 325-27 (referring to JX 292; "Q. What was the company with which you were speaking of [sic]? A. I have no idea.").

[191] JX 288.

[192] POB 38.

[193] The parties did not cite to any trial or deposition testimony regarding JX 288 or the incident involving Walter, and the Court knows of none other than that from the Dahl deposition discussed in the text.

Coventry Court, Paulsen referred Walter to him, not Suer.[194] Dahl did not know that she was related to Suer, and did not know why she sent the invoice to Suer.[195]

Plaintiff also claims that Suer's decision to depose Daniel Almblade in August 2014 amounts to a breach of the Non-Interference Provision of the APA. Almblade is an employee of LTC Supply, a company that adjudicates bills for skilled nursing facilities.[196] LTC is not a competitor of DL, but it is important to DL's business. That is because, in fulfilling its bill adjudication function, LTC Supply can stand between DL and some of its customer-facilities, insofar as the facilities rely on LTC's expertise with billing to review requests for proposals and to determine if the vendors, like DL, are fairly charging the facilities under their relevant services contracts.[197] When Suer sought the deposition of Almblade, an individual he knows through working in the industry, Almblade asked him why.[198] The only reason Suer gave was that Almblade would find the deposition "very informative."[199]

DL posits that this statement, combined with some of the information provided to Almblade through Suer's counsel's questioning during the deposition, demonstrates that Suer's entire purpose in taking the deposition was to harm DL by undermining it in the

---

[194]   Dahl Dep. 173.

[195]   *Id*. at 176-77.

[196]   Tr. 564-68 (Navarro).

[197]   *Id.*

[198]   *Id*. at 853 (Almblade).

[199]   *Id*.; *id*. at 600 (Navarro).

eyes of LTC Supply. On balance, I find the evidence as to this aspect of DL's claim lacking. It could be inferred from the fact that Suer told Almblade that he would find the deposition "informative" that Suer intended to give information to Almblade in an effort to prejudice DL. That inference, however, has little else in the record to support it. Moreover, Suer, in defending against aggressive litigation from DL, reasonably could have concluded deposing Almblade, who is knowledgeable about bill adjudication and the nature of the skilled nursing facility industry, probably would lead to relevant evidence in this case. Based on the paucity of evidence as to Suer's allegedly improper motive in this regard, I find that DL failed to satisfy its burden of proof on this point.

### D. Procedural History[200]

Plaintiff, DL, commenced this action on October 10, 2012 and amended its complaint on February 4, 2013. The amended complaint (the "Complaint") charges Suer with breaches of the DLPA and the APA (Count I), misappropriation of trade secrets (Count II), and tortious interference with DL's contracts with North American (Count III).[201] DL's Complaint seeks the following by way of relief: a permanent injunction against further breaches of the Agreements; specific performance of the Restrictive Covenants; damages; and reimbursement of its attorneys' fees and costs.[202] On March 8,

---

[200]   In addition to the motions described in this Section, a number of other motions were filed, argued, and decided in this action. I note here only those that are relevant for purposes of this Memorandum Opinion.

[201]   Compl. ¶¶ 22-42.

[202]   *Id.* at Prayer for Relief A-F.

44

2013, Defendant, Suer, moved to dismiss or stay this action in favor of arbitration. After full briefing and argument, I denied that motion.[203]

On January 7, 2014, Suer filed a petition under Chapter 7 of the U.S. Bankruptcy Code, resulting in an automatic stay of this action.[204] On March 27, 2014, upon a motion by DL, the U.S. Bankruptcy Court for the Central District of California modified the automatic stay to permit Plaintiff to proceed with this action "with respect to its claims for injunctive relief from breach of contract."[205] DL's claims for misappropriation of trade secrets and tortious interference with contract remain stayed, as do any claims for monetary damages based on the alleged breaches of contract.

Suer moved for partial summary judgment on April 7, 2014, and amended that motion on May 23, 2014. Before argument on that motion, DL filed a motion of its own for sanctions for suppression or spoliation of evidence (the "Motion for Sanctions").[206] Defendant responded by cross-moving for sanctions for witness tampering.[207]

At the pre-trial conference on September 24, 2014, I denied Suer's motion for summary judgment. Specifically, I held that material issues of fact precluded entry of judgment in favor of Defendant as to each of his three grounds for summary judgment.

---

[203] *Kan-Di-Ki, LLC d/b/a Diagnostic Labs. v. Suer*, C.A. No. 7937-VCP, at 32 (Del. Ch. June 19, 2013) (TRANSCRIPT).

[204] D.I. Nos. 131-132; Joint Stip. II.A.14.

[205] D.I. No. 133 Ex. A.; Joint Stip. II.A.15.

[206] D.I. No. 215.

[207] D.I. No. 220.

45

Those issues of fact related to: (1) the alleged expiration of the Restrictive Covenants under the terms of the DLPA and APA;[208] (2) the possibility of this Court tolling or otherwise extending those Covenants for purposes of an equitable remedy;[209] and (3) the validity of the Covenants under California law.[210]

A five-day trial was held from September 29 to October 3, 2014. At the close of trial, I reserved judgment as to Plaintiff's Motion for Sanctions,[211] and denied Defendant's cross-motion for witness tampering.[212] This Memorandum Opinion contains both my post-trial findings of fact and conclusions of law relating to the merits of DL's case, and my ruling on the outstanding Motion for Sanctions.

### E. Parties' Contentions

DL contends that it has proven that Suer breached the Non-Interference Provision of the APA, the Non-Competition Provisions in both the DLPA and the APA, and the Confidentiality Provisions in both the DLPA and the APA. Thus, Plaintiff argues that it is entitled to an injunction preventing Defendant from breaching those provisions in the future. In particular, DL asserts that: "Suer will continue hurting DL unless an injunction

---

[208] *Kan-Di-Ki, LLC d/b/a Diagnostic Labs. v. Suer*, C.A. No. 7937-VCP, at 90 (Del. Ch. Sept. 24, 2013) (TRANSCRIPT).

[209] *Id.* at 94.

[210] *Id.* at 95-96.

[211] Tr. 1275-76.

[212] Tr. 1289.

issues that prevents him from working for skilled nursing facilities, mobile x-ray vendors, and mobile laboratory vendors."[213]

Suer contends that the Covenants are unenforceable under both California and Delaware law. He also asserts that, in any event, the provisions of the DLPA and the APA have expired, and that no equitable tolling is appropriate here. Finally, Defendant denies that the record supports a finding that he violated the Covenants, and further argues that, even if such a breach is found, no injunctive relief is warranted here.

## II.    LEGAL STANDARD

### A.    Delaware Law Governs Both the DLPA and the APA

The parties dispute whether California or Delaware law governs the DLPA and the APA. "Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[214] By statute in Delaware, when parties to a contract memorialize in writing their agreement that Delaware law governs that contract, such a choice of law "shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State."[215]

---

[213]    PRB 1-2.

[214]    *J.S. Alberici Constr. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

[215]    6 *Del. C.* § 2708(a); *Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 884 (Del. Ch. 2009) ("In light of [Section 2708(a)], Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected is reasonable in light of the parties' contractual objectives.").

The DLPA and the APA each contain a provision in which the parties agreed to be bound by Delaware law.[216] Additionally, Suer signed an affidavit in connection with his execution of the APA, in which he affirmed that he intended for Delaware law to apply to the APA, and for the provisions of that Agreement to prevent the parties to the APA from even arguing that the law of any jurisdiction other than Delaware should apply to that Agreement.[217] When sophisticated parties, like those in this case, execute agreements pursuant to which millions of dollars and control of various business entities change hands, this Court generally will enforce the parties' own choice of law provisions.[218] Allowing Suer later to walk away from the agreements he admittedly signed, and under which he was paid roughly $4.4 million in the aggregate, would both deprive DL of the benefit of its bargain and undermine the ability of commercial parties to establish with certainty the rules that will govern their relationship in future cases.[219] My decision to honor the parties' choice of Delaware law here is buttressed by the facts that multiple parties to the earlier of the relevant agreements are Delaware business entities, and the later agreement was executed in Delaware.[220] Thus, I find the parties' selection of Delaware law to be reasonable in light of their apparent contractual objectives. In

---

[216]  DLPA § 12.10; APA § 7.6.

[217]  JX 50; Tr. 404-05 (Suer); *supra* note 25.

[218]  *E.g.*, *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006).

[219]  *Id.* at 1048.

[220]  *See* DLPA, Preamble; APA § 2.5; JX 51.

accordance with 6 *Del. C.* § 2708(a) and the *Total Holding USA* case, therefore, I accept the contractually designated choice of Delaware law in this matter.

Suer argues that because DL seeks to enforce non-competition provisions, which are disfavored under California law,[221] adhering to the parties' contractual choice-of-law provisions would undermine California public policy and run afoul of interstate comity. While Defendant invokes a valid principle of law in this regard,[222] his argument is not persuasive. To take advantage of this Restatement-based exception, Suer would have to demonstrate both: (1) that enforcement of the Non-Competition Provisions would be contrary to California public policy—even assuming that California would be the state whose law would apply if not for the choice-of-law provisions; and (2) that California has a "materially greater interest" than Delaware in the enforcement or non-enforcement of the Non-Competition Provisions.[223] California law generally does enforce non-

---

[221] Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.").

[222] *E.g.*, *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015) ("[The Restatement (Second) of Conflict of Laws, which Delaware follows,] is generally supportive of choice-of-law provisions, but recognizes that allowing parties to circumvent state policy-based contractual prohibitions through the promiscuous use of such provisions would eliminate the right of the default state to have control over enforceability of contracts concerning its citizens.").

[223] Those elements would have to exist under the relevant Restatement analysis for Suer to succeed on his argument. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless . . . application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially

49

competition agreements that were executed in connection with the sale of the goodwill of a business.[224] Based on the evidence adduced at trial, that carve-out from California's general rule against non-competes would apply to Suer in that he was a seller of the goodwill of a business under both the DLPA and the APA.[225] Suer makes no serious attempt to contend that those agreements were not legitimate sales of businesses within the meaning of the relevant carve-out. Admittedly, there could be scenarios in which an employer tries to skirt California's policy against non-competes by orchestrating a sham transaction. Based on the evidentiary record in this case, however, I am convinced that did not occur here. I therefore reject Defendant's arguments in this regard and conclude that Delaware law applies to both the DLPA and the APA.

---

greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.").

[224]   Cal. Bus. & Prof. Code § 16601 ("Any person who sells the goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on . . . .").

[225]   *See supra* Section I.B.1-2. The non-competition provisions DL seeks to enforce are found within, and were integral to, the agreements pursuant to which Suer sold the goodwill of his businesses, not within a separate employment agreement. That fact makes this case materially distinct from cases like *Ascension Insurance Holdings*, which Defendant cited in support of Suer's position at oral argument. *Ascension Ins. Hldgs., LLC*, 2015 WL 356002, at *3 ("The evidence does not support a finding that the covenant not to compete found in the EIA was a negotiated part of the asset purchase; thus, it could not have been relied upon by the parties as security against competitive impairment by the seller of the goodwill and assets purchased, which is the sole ground upon which California relaxes its public policy prohibition against covenants not to compete.").

50

## B.      Applicable Legal Principles

To prove a breach of contract under Delaware law, DL must show: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages.[226]    After a full trial on the merits, a plaintiff bears the burden of proving the elements of its contract claim by a preponderance of the evidence.[227]

## III.      ANALYSIS

Applying those principles to the evidence adduced at trial, I first conclude that the Restrictive Covenants in the DLPA and APA are enforceable under Delaware law.  I next address whether the evidence shows that Suer breached those Covenants, and determine that it does.  As to Defendant's contention that the Covenants have expired, I conclude that the plain language of the Agreements supports his assertion, but only as it relates to the Non-Competition Provisions, which were limited to five years.   As to Suer's contention that the Covenants have expired, I conclude that the language of the Agreements supports that assertion, but find that fact ultimately irrelevant to the determinative issues of whether DL: (1) proved its breach of contract claim; and (2) is entitled to injunctive relief.

## A.      The Covenants are Enforceable Under Delaware Law

Under Delaware law, a restrictive covenant, such as a non-competition provision, is enforceable if: (1) it meets general contract law requirements, (2) is reasonable in

---

[226]    *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[227]    *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 4390726, at *13 (Del. Ch. Sept. 22, 2011), *aff'd in part and rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013).

scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities.[228] If the restrictive covenant in question was obtained as "part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract."[229] Suer does not dispute that the DLPA and the APA meet the general contract law requirements of offer, acceptance, and consideration.[230] Thus, I limit my inquiry to the contested issues of whether the Restrictive Covenants are reasonable in scope and duration, advance a legitimate interest of DL's, and are not so inequitable that the Court should refuse to enforce them. For the reasons stated below, I conclude that the Covenants are enforceable under Delaware law.

First, the scope and duration of the Restrictive Covenants are reasonable under the circumstances of this case.[231] The Non-Competition Provisions have a term of five years, and their geographic scope includes the twenty-three states west of the Mississippi

---

[228] *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (citing *Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992)).

[229] *Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at *10 (citing *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 465 (Del. Ch. 1977)).

[230] *E.g.*, Def.'s Br. 29-35.

[231] "When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together. The two dimensions necessarily interact." *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011).

River.[232] Non-competition agreements of that length, and of that geographical scope and broader, have been found reasonable by Delaware courts in cases where the restrictive covenant is executed as part of the sale of a business as a going concern.[233] Based on the circumstances of this case, especially including the competitive nature of the industry and the depth of Suer's knowledge of DL's business practices, I find that the temporal and geographic limits of the Restrictive Covenants were reasonable in light of the parties' commercial goals in executing the DLPA and the APA.

The strongest argument Suer makes in this regard is that DL has overreached geographically. When the more recent of the contracts (the APA) was entered into, DL apparently operated only in Delaware and California. Through affiliates that were encompassed by the Non-Competition Provisions, however, DL also operated in New Mexico, Texas, Missouri, Oklahoma, Kansas, and Nebraska at that time. More importantly, during the period of the Non-Competition Provisions' effectiveness, DL's business expanded to include all the states covered by the "Restricted Area" except for

---

[232] APA § 1 (defining "<u>Restricted Area</u>"). As discussed *infra* in Section III.C, the temporal duration of the Restrictive Covenants is a disputed issue in terms of whether an equitable basis exists for extending their effect. The Non-Competition Provisions were limited expressly to five years. The other Restrictive Covenants are not expressly limited to five years, but arguably are so limited by Section 6.3 of the APA. The parties' competing arguments on that issue, however, are not relevant to the question of enforceability.

[233] *See Tull v. Turek*, 147 A.2d 658, 663-64 (Del. 1958) (finding reasonable a ten-year non-compete that covered the State of Delaware); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (finding reasonable a four-year non-compete that covered the entire United States); *Hough Assocs., Inc.*, 2007 WL 148751, at *14 (finding reasonable a five-year non-compete that extended for a fifty-mile radius around plaintiff's business).

53

Montana, Wyoming, North Dakota, Minnesota, and Iowa. Furthermore, for a non-competition agreement to satisfy this element of the reasonableness test, Delaware law does not impose a strict requirement that the area covered by the covenant map perfectly onto the geographical area of the plaintiff's business. "[T]he reality is that it is the employer's goodwill in a particular market which is entitled to protection."[234] If that market or the customer base of the business "extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market," then the employer and the business may enter into an enforceable contract prohibiting the employee "from soliciting those customers on behalf of a competitor regardless of their geographic location."[235] Applying these legal principles to the facts of this case, I find unpersuasive Defendant's argument that the Restrictive Covenants were unreasonable based on the imperfect manner in which the Restricted Area mapped onto the actual area in which DL operated at the time of contracting.[236] The facts bear out the reasonableness of DL's desire to prevent Suer from

---

[234] *Pfuhl*, 1992 WL 345465, at *12.

[235] *Id*. (emphasis in original).

[236] DL and Suer dispute whether the geographic scope of a reasonable non-compete can extend to areas where a party's business is likely to go. DL cites non-Delaware case law supporting its argument, but I need not dilate further on the issue other than to say that DL has satisfied the relevant analysis as it is articulated in cases like *Pfuhl*, on which Suer heavily relies in this regard. DAB 30-31. If DL's business, in fact, had not expanded to cover nearly all of the states subject to the Restrictive Covenants, the geographical reasonableness of the Covenants might have presented a closer question. But, the facts bore out the expanding and geographically far-flung nature of DL's business in such a way that the parties

competing or interfering in their business operations after they purchased his businesses, and the temporal and geographic scope of the Restrictive Covenants were reasonably calibrated to accomplish those mutually agreed upon goals.

The Restrictive Covenants also protect legitimate interests of DL. "Legitimate interests" recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse.[237] By bargaining for the inclusion of the Restrictive Covenants in the DLPA and APA, DL was protecting its legitimate economic interest in maintaining the business relationships it or its predecessor had with the various skilled nursing facilities it provided services to, including the North American facilities, some of which ultimately terminated their relationship with DL. When it paid $4 million and then roughly $300,000 to acquire Suer's interests in two successive businesses, DL acted reasonably and legitimately in insisting on some measure of protection from the possibility that Suer simply would go out and take those clients or otherwise undermine DL's business to Suer's benefit by using information he gained during his involvement with the businesses DL had purchased. "In other words, [DL] safeguarded its investment in [Suer] by ensuring that he could not sell himself directly to a competitor serving [DL clients] and cut out [DL]."[238] The Restrictive

---

reasonably could have required Suer to accept a non-compete of the scope and duration prescribed.

[237] *Pfuhl*, 1992 WL 345465, at \*12; *see also, e.g.*, *Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at \*10.

[238] *Hough Assocs., Inc.*, 2007 WL 148751, at \*14.

Covenants DL obtained therefore served a legitimate purpose for DL, and by seeking to enforce the terms of those Covenants, DL has not exceeded the scope of that legitimate interest. These same considerations lead me to conclude that, on balance, there is nothing inequitable about allowing DL to enforce the Restrictive Covenants according to the terms for which Suer and DL bargained.[239]

In sum, the Restrictive Covenants are enforceable under Delaware law, because they meet general contract law requirements, are reasonable in scope and duration, advance a legitimate economic interest of the party enforcing the covenant, and will survive a balancing of the equities.

### B. Defendant Breached the Restrictive Covenants

### 1. The Non-Competition Provisions

The DLPA Non-Competition and the APA Non-Competition Provisions are similarly worded, and each provides that for a period of five years from the execution of the respective agreement, Suer would not "engage directly or indirectly in all or any portion of the Business" within the Restricted Area.[240] The DLPA generally defines Business as the business of the Acquired Companies; the Acquired Companies in that instance were essentially Old DL and related entities.[241] The APA specifically defines

---

[239] I discuss the relevant equitable balancing issues raised in this case in more detail *infra*, in connection with my analysis of whether injunctive relief is appropriate.

[240] DLPA § 6.11; APA § 5.4.1.

[241] As discussed *supra*, Suer had approximately a ten percent profit participation interest in Old DL, which accounted for his being paid $4 million in connection with the DLPA.

"Business" as "the business of providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services." Thus, the Non-Competition Provisions appear to be garden-variety covenants designed to prevent the seller of a business (Suer) from quickly going back to his established customers and re-taking their business from the buyer.

The factual record supports the conclusion that Defendant breached the Non-Competition Provisions, although not quite to the extent Plaintiff contends. The entirety of Suer's wrongful activity was committed in his capacity as a consultant for North American. North American operates skilled nursing facilities; it does not engage in the Business from which Suer was barred by the Non-Competition Provisions—*i.e.*, providing mobile diagnostic services. Rather, North American was a customer of DL's services, not a competitor seeking to provide those same services in the market. Actions Suer took on behalf of North American were, therefore, by definition, generally not in competition with DL. Thus, I conclude that the record does not support DL's assertion that Suer *directly* engaged in competition that was proscribed by the DLPA or the APA.[242]

---

[242] Plaintiff asserts that, because Suer was paid for assisting competitors of DL, which Suer denies, he directly engaged in competitive Business. PRB 12. I conclude that that argument, including the factual dispute over whether and how much Suer was paid, is a red herring. Whether or not Suer received payment in exchange for his allegedly impermissible actions does not change the nature of those actions as either *direct* or *indirect* competition. Directly engaging in the proscribed Business would entail the actual provision of mobile diagnostic services to nursing facilities by Suer himself. DL does not assert that Suer, or his employer, North American, provided any such services directly, on their own account—nor could it so assert, based on the record adduced at trial. Assisting or facilitating another in the

Each of the Non-Competition Provisions, however, also prohibits Suer from engaging in competitive Business *indirectly*. The evidence supports to some extent DL's claim that Defendant breached the Non-Competition Provisions by engaging indirectly in competitive Business by assisting competitors of DL. In particular, the factual record shows that Suer was involved in Quality Medical's efforts to replace DL as the service provider for several North American facilities. Those efforts were successful and Quality Medical was among the vendors North American selected to provide services to its facilities after cancelling the DL contracts. The emails from Faselt, combined with the testimonial evidence and other documents, demonstrate that Suer provided Quality Medical with information about DL's pricing that would have enhanced Quality Medical's ability to under-bid DL and succeed in acquiring some of the contracts previously held by DL. Thus, in those instances, Suer indirectly engaged in the Business of DL, by assisting one of its competitors in the provision of relevant services.

Plaintiff also proved that Suer provided assistance to at least UCI, Town & Country, and CERF Laboratories during the transition period after North American cancelled its DL contracts and began obtaining service from new vendors. Paulsen's email identifying Suer as a point person for making sure the North American facilities administrators' needs for such services were met evidenced Suer's involvement in this regard. I conclude, therefore, that by assisting CERF Laboratories and other vendors to replace DL as service providers at various North American facilities, Suer indirectly

provision of those services amounts, at most, to *indirectly* engaging in the Business, regardless of whether Suer was paid for his assistance.

58

engaged in the Business in violation of the Non-Competition Provisions. That is, Suer lent his knowledge and expertise to North American on behalf of DL's competitors to facilitate their provision of the relevant mobile diagnostic services.

DL failed to prove, however, that Defendant breached the Non-Competition Provisions in connection with his alleged activities with Schryver Medical and B.O.N. For the reasons discussed above, the record does not support a finding that Suer's involvement with those companies rose to the level of assisting or facilitating their efforts to engage in DL's Business. One material difference between the facts relating to those competitors as compared to Quality Medical and CERF Laboratories is that the evidence regarding the latter two companies shows that Suer, in violation of the Non-Competition Provisions, took actions that advanced those companies' efforts to provide mobile diagnostic services. The same is not true with the others, despite Plaintiff's arguments to the contrary. The best example in this regard is with B.O.N. DL relied almost entirely on Treese's testimony to prove this particular breach. As previously discussed, however, the credibility of Treese's testimony is suspect. Based on that circumstance, together with absence of any contemporaneous documents showing that Suer played a role in B.O.N.'s attempt to engage in DL's Business in southern California, which ultimately failed anyway, I find that DL failed to meet its burden of proof in terms of the alleged breach involving B.O.N.

As it relates to Chris Walter, Suer's mother, the record also is devoid of adequate support for DL's claim that Suer breached the Non-Competition Provisions by forwarding an email from her to North American. Even if Walter's provision of infection

59

control services fell within the proscribed Business of the DLPA and APA, Suer's forwarding of her email in search of payment of an invoice does not prove that he assisted her in acquiring the contract to provide those services in the first place. Indeed, the only evidence in the record, Dahl's deposition testimony, indicates that Suer did not have such a role. The other action Suer took in September 2013, communicating with unidentified laboratory services providers in northern California, similarly lacked sufficient detail or evidentiary foundation to support a conclusion that DL had shown, by a preponderance of the evidence, that Suer breached the Non-Competition Provisions in that regard.

## 2. The Non-Interference Provision

Pursuant to the Non-Interference Provision of the APA, Suer agreed that he would not take any action that is designed or intended to have the effect of encouraging any customer of DL to alter its relationship with DL. The evidence clearly shows that Suer violated this covenant by auditing DL's invoices and playing a pivotal role in North American's decision to make wholesale challenges to DL's billing. Even if the only result that flowed from Suer's actions in this regard was that North American succeeded in obtaining invoice credits from DL, that may have been enough to demonstrate that he "encourage[ed] a customer of DL's to alter its relationship with DL," and thereby violated the Non-Interference Provision. The record shows far more, however. In fact, I find that Suer's actions contributed significantly to North American's decision to cancel all of its contracts with DL. During the relevant time period, North American and Suer attempted to conceal from DL the fact that Suer was working at North American. In

addition, Suer expressed his intent on more than one occasion to "take down DL." Considering all of these facts in the context of the evidence as a whole, I find that, through his actions, Suer not only encouraged, but actively facilitated, North American's drastic alteration of its relationship with DL.

In denying that he engaged in actionable interference, Suer contends that simply auditing DL's bills should not qualify as interference under the APA. He asserts that the act of auditing was "neutral," and that he never "encouraged" North American to take actions adverse to DL, but rather tried to patch up the relationship at various points.[243] The evidence, however, belies Suer's benign characterization of the events relating to the relationship between North American and DL. Preliminarily, I question whether someone with Suer's extensive knowledge of DL's confidential information could perform the auditing function Suer undertook for such a major customer of DL as North American without inevitably violating either the Non-Interference Provision or the Confidentiality Provision. But, even assuming Suer could, the evidence shows that Suer not only audited DL's bills with an eye toward finding areas to dispute DL's invoices and extract concessions, but he also materially assisted North American in effectuating the resulting cancellations. Thus, Suer breached the Non-Interference Provision by participating in a partisan way adverse to DL in the auditing of DL's billing of North

---

[243]    Def.'s Br. 56-57.

American, in encouraging and assisting North American to challenge DL's invoices and seek credits, stop payment, and ultimately terminate its contracts with DL.[244]

### 3. The Confidentiality Provision

The Confidentiality Provision of the APA prohibits Suer from directly or indirectly using or disclosing any of DL's confidential or proprietary information or trade secrets relating to the Business. The evidence demonstrated that Suer breached this covenant. The most prominent instance of Suer using and disclosing DL confidential information was in his assistance of Quality Medical. The Faselt emails showed that Quality Medical was able to pursue North American's business with the knowledge of exactly how low it needed to bid in order to beat DL's pricing. Defendant's only counter-arguments in this regard are that there is no evidence proving that Suer provided Quality Medical with any pricing information, and that the pricing information was well-known. Both of those contentions are controverted by the record, and in particular by the contemporaneous emails demonstrating that "BS" was being consulted as to the pricing of DL's services contracts.[245]

---

[244] DL asserts that Suer also breached the Non-Interference Provision by "failing to refer customer inquiries to DL," and using the deposition of Daniel Almblade to smear DL. POB 49-50; PRB 10. As to the first point, I assume DL is referring to the September 2013 emails involving Suer and a potential replacement lab for a North American facility that had cancelled its contract with DL. Both that situation and the Almblade deposition are discussed *supra* in Section I.C.4. In both situations, the evidence is too weak to prove any breach of the Non-Interference Provision by Suer.

[245] My specific conclusion as to Suer's use of DL confidential information in connection with Quality Medical comports with the evidence showing that Suer knew of DL's reliance on certain large customers, and knew that, because of

The record also shows that Suer accessed a DL customer Receivables List through his email account in April 2012. That List contained the names of DL's customers and provided for each customer contact information, and information as to the volume of its contract services and outstanding balances, among other things. Although this type of information appears to fall within the Confidentiality Provision, the weight of the evidence does not support a finding that Suer "disclosed" or "used" it in connection with his work at North American. Thus, this aspect of Plaintiff's claim for breach of the Confidentiality Provision has not been proven. DL counters that Suer never denied accessing or using the confidential customer Receivables List, but it was DL's burden to prove that he did so. DL did not prove by a preponderance of the evidence that Suer, in fact, did disclose or use information from the Receivables List.

## C. The Restrictive Covenants Have Expired

The Survival Clause in Section 6.3 of the APA provides that, "The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years [*i.e.*, until May 20, 2014] , and (ii) the statute of limitations in respect of the subject matter described herein." The parties vigorously dispute the effect of this provision on the issue of whether the Restrictive Covenants have expired.[246] DL

---

certain pressures from its investors, DL would be willing to negotiate and capitulate to North American's demands for invoice reductions.

[246] For reasons I explain more fully *infra*, this aspect of the parties' dispute is overblown and largely irrelevant. Whether the Restrictive Covenants remain in effect or already have expired does not impact the issue of whether Suer breached his obligations under the Covenants during the time period when they indisputably were in effect. I have concluded that he did. Thus, the relevant question becomes

interprets the Survival Clause to mean that, because Delaware has a three-year statute of limitations for breaches of contract, the Restrictive Covenants—including the Non-Competition Provisions—were to remain in effect for a period of three years following the latest breach of those Covenants. Thus, Plaintiff asserts that: (1) because Suer continued breaching the Non-Competition Provisions until September 26, 2013, the Non-Competition Provisions will continue in effect until September 26, 2016; (2) because Suer continued breaching the Non-Interference Provision until August 2014, that covenant survives until August 2017; and (3) because Suer breached the Confidentiality Provision in April 2012, that covenant survived until April 2015.[247] Alternatively, DL contends that the Court should equitably toll the relevant obligations under the Restrictive Covenants so that DL can enjoy the bargained-for benefit that it was deprived of by Suer's breaches. For the reasons stated in this Section, I conclude that the Restrictive Covenants have expired, and that DL's request for equitable tolling should be analyzed as a request for equitable relief from Suer's breaches, which I address in Section III.D *infra*.

**1.      Under the terms of the Agreements, the Restrictive Covenants have expired**

The parties executed the DLPA on July 28, 2008, and the APA on May 20, 2009. Because the APA came later (and "reaffirmed" Suer's commitments under the DLPA), I consider only the APA for purposes of whether any of Suer's obligations under the

---

what injunctive remedy, if any, is appropriate. The squabble about whether the Restrictive Covenants already expired or still have a few months to run does not materially affect my determination in that regard.

[247]      POB 56-57.

Restrictive Covenants remain in effect as a matter of contract law. The Survival Clause, which Plaintiff relies on for its interpretation of the length of the Non-Competition Provision, appears in Section 6.3, the final subsection of Section 6, which relates to "Indemnification."[248] The Non-Competition Provision in Section 5.4 of the APA, however, expressly states that, "***For a period of five years from and after the Closing Date***, neither [South Coast] nor [Suer and BCCC] will . . . directly or indirectly engage in . . . the Business in the Restricted Area."[249] DL either glosses over this language, or contends that the Survival Clause somehow overrides it, so that the Non-competition Provision does not expire five years after the Closing Date, but rather is extended for the statute of limitations period (three years) each time a breach occurs.

In effect, therefore, Plaintiff is asking the Court to apply a general clause in an unrelated part of the APA to override the specific language of the Non-Competition Provision in Section 5.4, so that potentially the length of that restrictive covenant will be longer. Under Delaware contract law, "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[250] As it relates to the Non-Competition Provisions, therefore, DL's interpretation of the APA is unreasonable.

---

[248] APA § 6.

[249] APA § 5.4.1 (emphasis added).

[250] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

The Non-Competition Provision of the APA, by the plain language of Section 5.4, began on the Closing Date of May 20, 2009, and expired five years later, on May 20, 2014.[251]

In arguing to the contrary, DL contends that if the Non-Competition Provisions are limited to the fixed five-year time period expressly contained within them, that would render Section 6.3(ii) mere surplusage, a result eschewed by the applicable canons of contract interpretation under Delaware law.[252] I disagree. Reading the APA as a whole, which Delaware law requires me to do, makes it clear that Plaintiff's argument artificially puts Section 5.4 and Section 6.3 in conflict with one another, such that one or the other would contain a meaningless provision. Applying the statute-of-limitations extension trigger in Section 6.3(ii) would require me to ignore the plain statement in Section 5.4.1 that the Non-Competition Provision lasts for five years from the Closing Date. The more reasonable reading of Section 6.3(ii) is that it relates to the representations, warranties, covenants, and agreements "*contained herein*"—*i.e.*, in Section 6, concerning the parties' Indemnification obligations.[253] Thus, if a party has a right to Indemnification under

---

[251] Although I need no other basis to reject DL's argument as to the expiration of the Non-Competition Provisions, I note that, under its interpretation, that Provision theoretically could extend for eternity. Suer could breach before May 20, 2014, triggering a three-year extension, and then breach again just before that extension ran out, and so on. Such an interpretation, however, would lead to an absurd result and thereby violate a basic canon of contract interpretation. *E.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).

[252] *Id.*

[253] APA § 6.3 (emphasis added) ("Survival. The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years, and (ii) the statute of limitations in respect of the subject matter described herein.").

Section 6.1 or 6.2, that right survives, under Section 6.3, for the longer of five years (romanette (i)), and the statute of limitations relating to the indemnified claim (romanette (ii)). That interpretation harmonizes Section 6.3 with the unambiguous language in Section 5.4 limiting the Non-Competition Provision to "a period of five years," and gives effect to the more specific of the two provisions.[254] I therefore conclude that the Non-Competition Provision lasted only for a period of five years from the Closing Date, and therefore expired on May 20, 2014.

Unlike the Non-Competition Provision, neither the Non-Interference Provision nor the Confidentiality Provision contains a specific time limitation.[255] Relying again on the Survival Clause in Section 6.3(ii), DL contends that the Non-Interference Provision survives until August 2017 because Suer continued breaching it until August 2014, and that the Confidentiality Provision survived until April 2015, based on Suer's breach in April 2012. I need not address continuing effectiveness of the Confidentiality Provision as a contractual matter, because even under Plaintiff's interpretation, it already has expired.

---

[254] In a transcript ruling at the pre-trial conference, I denied Suer's motion for summary judgment in part on grounds that the Survival Clause was ambiguous. Having now had the benefit of a trial and post-trial briefing, I have concluded that the Survival Clause is not ambiguous and should be read as discussed here. That conclusion, however, does not mean that Suer is entitled to judgment as a matter of law, as he contends. *See* discussion on the propriety of injunctive relief here in Section III.D *infra*.

[255] APA §§ 5.3, 5.6.

As to the Non-Interference Provision, DL relies on Suer's deposition of Almblade as evidence that an alleged breached occurred as late as August 2014, thereby causing that Provision to extend until August 2017. Even if I accept, *arguendo*,[256] that DL's application of the Survival Clause to the Non-Interference Provision is sound, the factual record does not support this aspect of Plaintiff's argument. As I found earlier, DL failed to prove that Suer improperly interfered with DL's Business when he took Almblade's deposition. I also previously concluded that Suer's actions in connection with the unidentified vendor replacement in September 2013 did not amount to a breach of the Non-Interference Provision.[257] Thus, the last of the breaches of the Non-Interference Provision that DL proved at trial had ended by July 2012. Thus, even if Plaintiff's reading of the Survival clause were correct, the Non-Interference Provision expired at the end of July 2015, making it essentially moot, except as a potential basis for entry of a prospective permanent injunction.

### 2.    Plaintiff's plea for "equitable tolling" is misplaced

DL also contends that, if this Court concludes the Restrictive Covenants have expired according to their terms, the Court can, and should, extend those Covenants on the ground of equitable tolling.[258] What DL really is seeking, however, is for the Court to

---

[256]    As stated *supra* in this Section III.C.1, I read Section 6.3(ii) as relating to the Indemnification obligations in Section 6, rather than any of the Restrictive Covenants in particular. In terms of the Non-Interference Provision, however, I need not even reach that issue.

[257]    *See supra* Section III.B.1.

[258]    POB 57-60; PRB 24-28.

consider the contractual time period for which Suer had agreed to refrain from breaching the Restrictive Covenants in fashioning what DL considers an appropriate injunction that will make Plaintiff whole and confer upon DL the benefit for which it bargained.[259] I address the availability of such relief in the context of discussing an appropriate remedy in the following Section. In my opinion, it is neither necessary nor productive to analyze the issue within the framework of attempting to use equitable tolling to enlarge the effective time periods of the Restrictive Covenants.

### D. Remedy

As noted above, Plaintiff's claims against Suer automatically were stayed when he filed for bankruptcy in January 2014, with the limited exception of DL's claim for injunctive relief for breaches of the DLPA and the APA. Thus, to the extent DL might have a valid claim for damages based on loss of business or other harm caused by Suer's breaches, no such claim is before me at this time. Instead, DL asks the Court to enjoin Suer from continued breaches of his obligations under the Restrictive Covenants. To merit a permanent injunction, as DL seeks, it must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of

---

[259] *E.g.*, POB 1 ("DL, therefore, seeks an order enjoining Suer, for at least two years and five months from the date of judgment, from engaging in activities that are in breach of his covenants.").

issuing the injunction.[260] "Further, to gain specific performance of a covenant not to compete, these elements must be established by clear and convincing evidence."[261]

Before I address whether Plaintiff has satisfied those elements and is entitled to injunctive relief, I note that the parties dispute whether the Court's analysis must include a determination as to the allegedly "willful" nature of Suer's breaches.[262] DL cites cases from other jurisdictions that it contends support the proposition that "when determining whether an equitable remedy is appropriate courts look to whether the breach of a restrictive covenant was 'willful.'"[263] It is an equitable maxim that "he who comes into equity must come with clean hands."[264] But, the unclean hands doctrine has no application to DL's affirmative claims. Had Suer counterclaimed against Plaintiff and sought some form of equitable relief against it, which he has not, the unclean hands

---

[260] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486 (Del. 2010).

[261] *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007); *see also, e.g.*, *Cirrus Hldg. Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1201-02 (Del. Ch. 2001) ("[W]here, as here, the plaintiff ultimately seeks relief in the form of a decree of specific performance, the court must keep in mind, in assessing the reasonable likelihood of success, that the plaintiff will bear the burden of establishing its case by 'clear and convincing' evidence.").

[262] Def.'s Br. 11; PRB 27. Suer asserts that the reason DL has advanced this issue is because a finding of willfulness here might have an effect in the bankruptcy action in California—*i.e.*, it might strengthen DL's hand in arguing against affording Suer a discharge in that proceeding.

[263] PRB 27 n.6.

[264] 2 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE §§ 363, 397 (5th ed. 1941).

defense might have provided a basis to deny him such relief.[265]  In analyzing a plaintiff's claim for breach of contract under Delaware law, however, the Court generally does not inquire into the defendant's state of mind.[266]  I also see no merit in any argument by DL that the willfulness of Suer's breaches are relevant as part of balancing the equities in connection with my decision about the propriety of injunctive relief.  The balancing of equities in that regard focuses on "balancing the interests sought to be protected by [DL] against the injury that injunctive relief would cause to [Suer]."[267]  I therefore express no opinion as to whether Suer's breaches of the DLPA and the APA were "willful."

### 1.     DL is entitled to injunctive relief

The first element in deciding whether injunctive relief is appropriate is actual success on the merits.  As the foregoing analysis shows, DL has proven that Suer breached the Non-Competition Provisions, the Non-Interference Provision, and the Confidentiality Provision.  The first of those breaches occurred, based on the evidence adduced, in or around January 2012 when Suer began working for North American and interfering with DL's business relationship with North American's facilities.

---

[265]  *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998) ("The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name.  In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.").

[266]  *See supra* note 226 and related text (identifying elements of a breach of contract claim).  Whether the breach was intentional or willful is irrelevant.

[267]  *Pfuhl*, 1992 WL 345465, at *13.

71

In terms of irreparable harm, I note that each of the parties to the APA "acknowledge[d] and agree[d] that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed . . . or otherwise are breached or violated," and that "each party hereto will be entitled to an injunction . . . to enforce specifically this Agreement . . . ."[268] The DLPA contains a similar provision.[269] In the context of ordering injunctive relief stemming from breaches of a non-competition agreement, Chief Justice Strine, then writing as Vice Chancellor, observed that "our law has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached."[270] Based on the arm's-length agreement between DL and Suer that any breaches of the DLPA or the APA would result in irreparable harm, and on the factual record presented as to the nature, extent, and effect of Suer's breaches, I find that this requirement for injunctive relief has been satisfied.

Finally, I consider whether the harm that the requested injunction would cause to Suer outweighs the benefits of granting DL the injunctive relief it seeks. Defendant asserts that DL's relationship with North American is broken beyond repair, and that there is therefore likely to be little benefit to DL from a grant of injunctive relief here.

---

[268]    APA § 7.8.

[269]    DLPA § 12.12.

[270]    *Hough Assocs., Inc.*, 2007 WL 148751, at *18; *see also id.* ("Measuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy. This court has been candid to admit this reality and to use injunctive relief as the principal tool of enforcing covenants not to compete.").

Suer also alleges that he is the sole breadwinner of his family and would suffer greatly if enjoined from continuing to work in the industry. I find no merit to the argument that, because a defendant irreparably may have destroyed a business relationship with a major customer of a plaintiff, there is nothing to be gained by holding the defendant to the promises he made and later broke. As to the alleged hardship to Suer personally, as I discuss in more detail below, Suer will not be prevented from working in the nursing home field altogether. He will be enjoined, instead, from continuing to breach the obligations he undertook in the DLPA and the APA. Thus, I conclude that the balancing of the equities supports the issuance of injunctive relief in DL's favor.

## 2. The scope of the Court's injunction

At various points throughout the briefing, DL offered differing definitions of what, precisely, it seeks to enjoin Suer from doing.[271] Plaintiff ultimately requested at argument that Suer be enjoined "from working with any mobile x-ray or laboratory vendor, skilled nursing facility, or skilled nursing management company for a period of . . . two years and five months from the date of the injunction."[272] This request, however,

---

[271] *Compare* PRB 1 (seeking injunction "prevent[ing] [Suer] from working for skilled nursing facilities, mobile x-ray vendors, and mobile laboratory vendors."), *and* PRB 35 ("Suer should be enjoined from working for nursing homes, nursing home operating companies, and mobile x-ray and mobile laboratory providers. Under DL's proposed injunction, Suer could work for any vendor that does not compete with DL—for example, an oxygen company such as Pulmocare."), *with* POB 60 ("Suer will continue to cause harm to DL unless he is enjoined from working in the nursing home industry."), *and* POB 63 ("[I]f an injunction is granted, but Suer is permitted to continue working at North American or in the nursing home industry, it will be impossible to ensure his compliance.").

[272] Arg. Tr. 50.

73

goes considerably beyond the subject matter scope of the Restrictive Covenants DL bargained for from Suer. I address that issue next, and then will discuss the appropriate temporal duration of an injunction.

In terms of his obligations under the Non-Competition Provisions, Suer agreed not to "directly or indirectly engage . . . in the Business," with "Business" meaning "providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services." That was and is DL's line of business, and Suer promised not to compete with DL. Suer did *not* agree that he would refrain from working for skilled nursing facilities or skilled nursing management companies, except, perhaps, to the extent such a facility or company might engage in the business of providing mobile diagnostic services like DL. As for the Non-Interference Provision, Suer undertook not to "take any action that is designed or intended to have the effect of encouraging any lessor, licensor, supplier, distributor or customer of [DL] or its Affiliates . . . from altering its relationship with [DL] or its Affiliates in a manner adverse to [DL] or its Affiliates." Nothing in that Provision precludes Suer from working for any particular company or type of company, but it does preclude him—regardless of where he works or the nature of his responsibilities—from taking actions designed to interfere with DL's business relationships. In determining an appropriate remedy, therefore, my initial focus will be on enjoining Suer from: competing with DL, as defined in the Non-Competition Provisions; interfering in DL's business relationships, as defined in the Non-Interference Provision; and disclosing or using DL Confidential Information, as that term is defined in the Confidentiality Provisions.

The crux of this issue, and the reason the parties dispute it so vigorously, is whether Suer can continue to work for North American, and especially in the bill auditing function that gave rise to his multiple breaches of the Restrictive Covenants. Based on the record adduced at trial, it does seem to me that Suer will not be able to work on bill adjudication or auditing for North American or any other skilled nursing management company or for any skilled nursing facility for which DL currently provides services, because Suer has exhibited sufficient bias toward DL to make it unlikely that Suer could work in such a position without interfering with DL's current or prospective business relations. For that reason, Suer will be barred from bill adjudication or auditing at North American and the other types of companies mentioned above.

There is nothing about working for North American or another skilled nursing management company or skilled nursing facility, however, that is inherently violative of the terms of the Restrictive Covenants. Thus, I will decline to bar Suer from otherwise continuing to work for North American generally or from working for another skilled nursing management company or skilled nursing facility. Delaware courts "will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process."[273] DL did not negotiate for restrictive covenants that would preclude Suer from working in the "nursing home industry," or for skilled nursing

---

[273] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006).

75

management companies generally. Had it wanted such a broad restrictive covenant, DL could have attempted to obtain it at the bargaining table.

Turning to the temporal component of the injunction, and consistent with my conclusion that DL is entitled to the benefit of its bargain, I have determined that the injunction should remain in effect for two years. DL contends that it bargained for five years of compliance with the Restrictive Covenants, and because Suer began breaching in January 2012, DL only received that benefit for roughly two years and seven months. Accordingly, DL seeks an injunction for the remaining two years and five months. Although I generally agree with DL's premise, I conclude based on all the circumstances of this case, that a slightly shorter injunction is warranted. For example, some of the more significant breaches of the Restrictive Covenants did not occur until several months after January 2012. In this regard, I note that North American did not send out its Cancellation Letters until the end of June or early July, 2012. Defendant offers several reasons why the length of DL's requested injunction is unreasonable, but none of them justify shortening its length more materially. I reject in particular the argument that the injunction against Suer should be reduced for the time that elapsed during the pendency of this litigation as "time served." DL did not bargain for the right to litigate endlessly with Suer, and I decline to adopt a rule that might incentivize contractual parties to breach their agreements and then run out the clock during litigation. For all of these reasons, I have decided to limit the length of the injunction to two years from its entry.

## IV.    PLAINTIFF'S MOTION FOR SANCTIONS OR SPOLIATION

Before trial, DL moved the Court to order sanctions against Suer for alleged suppression or spoliation of evidence.  Plaintiff relies most heavily on documents it received from non-parties during discovery that it says Suer should have produced, but did not.  In particular, Plaintiff points to three sets of text messages between Suer and Dahl of Coventry Court: (1) texts from between April and September 2012 relating to UCI, Town & Country, and CERF Laboratories; (2) texts from the early December 2012 timeframe relating to CERF Laboratories and UCI; and (3) texts from early December 2012 relating to Terrace View, another North American facility.  DL also points to certain emails between Treese and Suer in April 2012 that were produced by Treese but not Suer.  Finally, DL asserts that Suer violated this Court's May 20, 2014 order granting DL's motion to compel certain discovery (the "May 2014 Discovery Order"),[274] by failing to supplement his interrogatory responses and provide documents relating to his work for Pulmocare, an oxygen services vendor for skilled nursing homes.  Based on this alleged misconduct, DL urges the Court to draw adverse inferences against Suer with respect to his alleged breaches of the Non-Competition Provisions and the Confidentiality Provision, and to afford no weight to any of Suer's testimony.[275]  DL also seeks its fees and costs associated with its Motion for Sanctions.

---

[274]    D.I. No. 168.

[275]    Pl.'s Mot. for Sanctions for Suppression or Spoliation (the "Motion for Sanctions") 2; Pl.'s Reply in Supp. of Mot. 15.

Suer essentially concedes that his duty to preserve evidence attached by April 4, 2012, at the latest, by which time he was communicating with his attorneys about possible allegations by DL that Suer was breaching his non-competition obligations.[276] As to why he failed to produce the relevant text messages, Suer now avers that he lost his cell phone in March of 2013.[277] Regarding the Treese emails, Suer asserts that, because they were sent and received between January and mid-April 2012, Suer deleted them in the ordinary course before his duty to preserve attached.

## A. Legal Standard

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[278] Whether a person has reason to anticipate litigation depends on whether the facts and circumstances lead to a conclusion that litigation is imminent or should otherwise be expected.[279] This Court may sanction a party who breaches this duty by destroying relevant evidence or by failing to prevent the destruction of such evidence.[280] It is appropriate, for example, for the Court to draw an adverse inference "where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is

---

[276] Def.'s Opp. to Pl.'s Mot for Sanctions 8-9.

[277] *Id.* at 12 n.6.

[278] *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009), *aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 750 (Del. 2010).

[279] *Id.* (quotation marks and citation omitted).

[280] *Id.*

78

relevant to a legal dispute or it was otherwise under a legal duty to preserve the item . . . ."[281] In this context, Delaware courts have defined recklessness as "a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled."[282]

## B.     Analysis

Based on the evidence discussed at length in this Memorandum Opinion, I find that Suer had reason to anticipate litigation by April 4, 2012, at the latest, when he began communicating with his attorney about the matters in dispute. Indeed, Suer makes no serious argument to the contrary. DL has at least a colorable argument that Suer's duty to preserve attached as early as January 2012, because Suer's summary judgment brief states that when he went to work for North American in January 2012, he "kn[ew] well that it could lead to a campaign of scorched-earth litigation against him."[283] This evidence buttresses my primary conclusion that Suer had reason to expect litigation by at least April 4, 2012. For purposes of the Motion for Sanctions, I need not decide whether Suer's duty to preserve arose even earlier, in January.

Based on the evidence presented, I am convinced that Suer was at least reckless with respect to his duty to preserve potentially relevant information and documents. With respect to the Treese emails, Suer does not dispute that he intentionally deleted them as

---

[281]     *Id.* at 1191.

[282]     *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011).

[283]     Pl.'s Reply in Supp. of Mot. 5.

late as April 18, 2012, which was two weeks after his duty to preserve attached. Thus, the deletion of those emails provides grounds for a finding of spoliation. This finding is supported further by the incriminating nature of the Treese emails and the fact that in a bankruptcy filing on April 16, 2012, Suer's wife explicitly mentioned the possibility that Suer would be involved in litigation with his former employer, *i.e.*, DL.

As to the text messages produced by Dahl but missing from Suer's production, the record on the Motion for Sanctions and at trial demonstrates that Suer's conduct was reckless. By December 2012, DL formally had requested production of relevant documents from Suer, including text messages. Suer represented to this Court in connection with his then pending motion to stay discovery that, "There is no reason for concern that any of the[] materials [DL sought in discovery] are 'subject to deterioration, manipulation, or even just being forgotten.'"[284] Relying in part on that representation, I granted Suer's motion and stayed discovery for a brief period of time.[285] In March 2013, only a few months after he assured the Court that no potentially relevant discovery would be in jeopardy, Suer allegedly lost his cell phone. While I infer no bad motive as to Suer's loss of this device, at no time has he ever explained to the Court what, if any, actions he or his counsel took between April 2012, when his duty to preserve arose, and March 2013 to attempt to preserve any information that might be on his phone or even to

---

[284] Def.'s Mot. to Stay Discovery [D.I. No. 20] 3.

[285] *Kan-Di-Ki, LLC d/b/a Diagnostic Labs. v. Suer*, C.A. No. 7937-VCP, at 69 (Del. Ch. May 9, 2013) (TRANSCRIPT); D.I. No. 56; *see also* D.I. No. 50.

consider that issue.[286]  Moreover, DL pressed Suer in 2014 as to whether he had produced all responsive text messages in his possession.  Instead of admitting that Suer's phone was gone, his counsel stated that Suer had no text messages, and represented that Suer "emails for business purposes but generally does not text."[287]  Based on these circumstances, I find that Suer was at least reckless in failing to take reasonable steps to ensure the preservation of potentially responsive information stored on his cell phone.

Suer makes several arguments against a finding of spoliation, but none are availing.  He asserts that if he had used text messages frequently for business purposes, DL would have obtained a larger number of them in its far-reaching third party discovery and proffered them as evidence.  Even if that were true, however, Suer still was reckless in failing to preserve and produce the text messages that he had that were responsive to DL's requests for production.  Second, Suer contends that because DL's third-party discovery failed to produce many "other-ends" of the purportedly missing communications that he failed to provide, it should be inferred that no such

---

[286]  I am not suggesting that Suer had to go to arguably unreasonable or unduly costly lengths to satisfy his obligations in this regard.  If Suer or his counsel had proffered evidence that they had considered whether and how to preserve any evidence that might exist on his cell phone, but concluded in good faith that it would have been impractical to do anything more than exercise care not to lose it, and that he did so but lost the phone anyway, perhaps that would have been enough to avoid a finding of recklessness.  But, in the circumstances here, with no evidence to the contrary, I conclude that Suer consciously disregarded the risk that evidence regarding the requested texts might be lost and did nothing to mitigate that risk, even after affirmatively assuring the Court that there was no reason for concern in that regard.  *See* Tr. 465-73 (Suer) (discussing measures taken to preserve emails, but not text messages).

[287]  Def.'s Mot. for Sanctions [D.I. No. 215], Ex. J.

81

communications exist. I disagree. Unlike Suer, the third parties were not under an obligation to preserve potentially relevant evidence, and it is plausible that, in the ordinary course of business, they could have deleted or failed to preserve texts that would have been relevant. Third, Suer insinuates that because DL failed to produce a large number, or perhaps any, text messages of its own, DL is in no position to challenge Suer's failure to do so. I reject that argument as well. DL's production or lack thereof is not at issue on the pending Motion for Sanctions. Moreover, there has been no showing that Suer ever made any motion to compel related to the absence of text messages from DL's production.[288]

In terms of sanctions for the spoliation, DL requests that I draw sweeping adverse inferences that Suer breached all of his Restrictive Covenants in relation to every breach DL alleges, and that I categorically disregard Suer's testimony as not credible. Although I grant DL's motion, I do not consider such broad adverse inferences to be justified. Instead, I have drawn more narrowly tailored inferences as indicated at several points throughout this Memorandum Opinion.[289] For example, where I found that the

---

[288] DL also accuses Suer of spoliation relating to Pulmocare based on allegations that arose after this Motion for Sanctions was briefed. Those allegations, therefore, are not fully developed in the parties' papers, and have not been shown to rise to the level of an independent instance of spoliation. They do confirm, however, that on more than one occasion, Suer took his discovery obligations under the Rules and this Court's orders too casually. The 2014 Discovery Order required Suer to produce, among other things, any evidence relating to his receipt of funds in the skilled nursing industry after January 2010. Yet, Suer never disclosed that he worked for Pulmocare nor appropriately supplemented his responses to interrogatories or requests for production after the 2014 Discovery Order.

[289] *See supra* Sections I.C.2.d-e.

evidentiary record appeared to be incomplete due to the absence of text messages that probably existed and should have been produced, I concluded that DL proved the specific breach it was attempting to prove, notwithstanding that the evidence of record, without more, might not have satisfied the preponderance of the evidence standard. Such inferences generally only confirmed conclusions that I otherwise reached on the basis of evidence DL did adduce. The few exceptions involved the Non-Competition Provision breaches relating to UCI and Town & Country.

Finally, I conclude that DL is entitled to the reasonable attorneys' fees and expenses it incurred in filing and prosecuting its Motion for Sanctions. This will include all such reasonable fees and expenses incurred through the date of the pre-trial conference, at which the Motion for Sanctions was argued. In terms of the trial and DL's post-trial briefing and oral argument, I hereby award DL its reasonable fees and expenses related to the Motion for Sanctions up to a maximum of $20,000.[290] If DL spent more than that amount after the pre-trial conference, it simply may include a statement to that effect in its affidavit and need not provide more detail.

## V. CONCLUSION

For the reasons stated in this Memorandum Opinion, I conclude that the Restrictive Covenants are enforceable under Delaware law, and that Plaintiff proved that Defendant breached those Covenants in the specific instances identified herein. Plaintiff, therefore, is entitled to injunctive relief in accordance with Section III.D.2, *supra*.

---

[290] In this regard, I note that DL devoted just over seven percent of its post-trial briefing to the Motion for Sanctions, and much of that referred back to the earlier briefing.

83

Plaintiff shall submit, on notice to Suer, a proposed form of final order and judgment implementing the rulings contained herein. In addition, Counsel for DL, within ten days of the date of this Memorandum Opinion, shall submit an affidavit indicating the reasonable amount of such fees and costs. To the extent Suer objects to any aspect of that affidavit or the amount of fees and costs claimed, he shall state all such objections in a written filing within ten days after the date DL files its affidavit. DL may file a brief reply within five days thereafter.